**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

TERRIE SNYDER,
Plaintiff-Appellee,

v.

SAMUEL J. RINGGOLD,                                       No. 97-1358
Defendant-Appellant,

and

WBAL DIVISION, THE HEARST
CORPORATION,
Party in Interest.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frank A. Kaufman, Senior District Judge.
(CA-95-3197-K)

Argued: December 4, 1997

Decided: January 15, 1998

Before LUTTIG and WILLIAMS, Circuit Judges, and
MERHIGE, Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Reversed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Charles Verderaime, VERDERAIME &
DUBOIS, P.A., Baltimore, Maryland, for Appellant. Jeffrey William

Bredeck, ECCLESTON & WOLF, Baltimore, Maryland, for Appellee. **ON BRIEF:** Thomas J. Althauser, ECCLESTON & WOLF, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Plaintiff-appellee, Terrie Snyder, filed a § 1983 claim seeking damages for alleged violations of her First and Fourteenth Amendment rights by the defendant-appellant, Samuel Ringgold. Plaintiff is a journalist who works in the print and television media. Defendant is the Director of the Public Affairs Division of the Baltimore City Police Department, and is responsible for the dissemination of information from the Department to the media. Plaintiff alleges that the defendant violated her constitutional rights by denying her access to Department information on the same terms that it was made available to other members of the news media. See J.A. at 7-15.

In 1992, Snyder aired a story for WBAL-TV that alleged that the Department might have attempted to cover up a prominent politician's connection to a young murder victim. See J.A. at 35. According to Snyder's affidavit, Ringgold later told Snyder that he believed she had "set him up" for that story, and Snyder then began to experience difficulties in obtaining information from Ringgold. J.A. at 36.

In 1993, the Department instituted a new policy requiring that all journalists obtain all information regarding homicides from a Public Information Officer (PIO) of the Department, rather than directly from homicide detectives. A PIO (Ringgold or one of his staff) would be "on call" to be paged on the weekends to provide information. According to Snyder, after this policy had been in place for several months, Ringgold advised Snyder and her then employer, WBAL-TV,

2

that he was tired of responding to Snyder's weekend pages. Snyder then wrote an article in the City Paper criticizing the new policy regarding the dissemination of information to journalists as an attempt to silence homicide detectives' complaints about Department policy. In that article, Snyder attributed a statement to Ringgold, stated that he claimed it was an off-the-record comment to another reporter (apparently at the assignment desk of WBAL-TV), and then alleged that the other reporter had confirmed that the comment was not, in fact, off-the-record. See J.A. at 16.

Thereafter, on May 31, 1994, Ringgold wrote a letter to the news director for WBAL-TV, stating that the situation regarding Snyder had "become intolerable." He expressed his "outrage[] that an off the record comment" he had made to one of WBAL's assignment editors "made its way into a City Paper article written by Terrie Snyder," and stated that, because of the incident, he would "never go off the record with people on [WBAL's] assignment desk" and had ordered his staff to do likewise. J.A. at 14. Ringgold also asserted in the letter that Snyder was continuing to abuse the paging system by paging PIOs needlessly on weekends. See J.A. at 15. The letter also stated that "[a]fter reading the City Paper article, I am of the opinion that Ms. Snyder has developed friendships in the department that prevent her from being an objective journalist." J.A. at 14-15. Finally, Ringgold complained that Snyder had falsely represented to WBAL that the Department had not provided her with all available information about a pending homicide case. See J.A. at 14.

Following the May 31, 1994, letter, Ringgold refused to allow Snyder to participate with a television crew from WBFF-TV in filming interviews with Department personnel in the Department's headquarters about the homicide division. Ringgold also contacted the editor of the City Paper and informed her that he would no longer talk to Snyder about any story. Unlike other journalists, Snyder was directed to submit all requests for information from the Department in writing. See J.A. at 7-9, 16c. Snyder alleges that Ringgold's motivation for these actions was his displeasure with her stories about the Department. Ringgold alleges that Snyder was singled out for access restrictions because she violated a promise of confidentiality by attributing "off-the-record" information, because she had repeatedly abused the Department's public information system by paging officers unneces-

3

sarily on weekends, and because she had misrepresented the Department's actions to her employer. See Appellant's Brief at 6.

Based on the foregoing events, Snyder brought this § 1983 suit, alleging that Ringgold violated the First and Fourteenth Amendments by placing restrictions on her access to Department information. Snyder then moved for partial summary judgment with respect to liability on her § 1983 claim. See J.A. at 17-19. Ringgold opposed Snyder's motion and filed a cross-motion for summary judgment. See J.A. 38-46. On January 6, 1997, the court denied Ringgold's motion for summary judgment and granted Snyder's motion for summary judgment on liability. See J.A. at 84. Even though the press has no general First Amendment right of access to information about police investigations, the district court held that, absent a "compelling governmental interest," once a government agency or official "makes such information generally available to the news media, such agency and/or official may not treat members of the news media, including the reporters working for such news organizations, unequally." J.A. at 85. The court found that "[t]he record establishes that the defendant [restricted plaintiff's access] because the defendant took issue with the substance and style of the plaintiff's reporting with regard to the [Department]," J.A. at 84, and therefore that defendant had violated plaintiff's First Amendment rights.

On January 28, 1997, the defendant, with leave of court, filed a supplemental motion for summary judgment, asserting the defense of qualified immunity. See J.A. at 56-58. On February 11, 1997, the court denied this motion, holding -- without analysis -- that defendant was not entitled to qualified immunity on plaintiff's claim. See J.A. at 88. Defendant appeals the district court's denial of qualified immunity.

We hold that the district court erred in denying defendant qualified immunity. Government officials are not liable for damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). Thus, qualified immunity "shields officials `insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

4

known.'" DiMeglio v. Haines, 45 F.3d 790, 794 (4th Cir. 1985) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

A right is "clearly established" for qualified immunity purposes if it has been "specifically adjudicated," Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992), that is, if it has been"authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state" in which the officers acted. Wallace v. King, 626 F.2d 1157, 1161 (4th Cir. 1980); see also Jenkins v. Tallaedega City Board of Education, 115 F.3d 821, 826 n.4 (11th Cir. 1997) ("[L]aw can be "clearly established" for qualified immunity purposes [in the Eleventh Circuit] only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose."). Additionally, a right may be clearly established even though it has not been specifically adjudicated when it is "manifestly included within more general applications of the core constitutional principle invoked." Pritchett, 973 F.3d at 314.

The right for which plaintiff contends has not been clearly established by specific adjudication. No Supreme Court or Fourth Circuit case has held that reporters have a constitutional right of equal or non-discriminatory access to government information that need not otherwise be made available to the public. In fact, the district court opinion below relied only on three, relatively old federal district court decisions and one state court of appeals decision in support of its holding that Ringgold had violated Snyder's First Amendment rights. See J.A. at 85-86 (citing Borreca v. Fasi, 369 F. Supp. 906, 909 (D. Haw. 1974); Quad City Community News Service, Inc.  v. Javens, 334 F. Supp. 8 (S.D. Iowa 1971); Westinghouse Broadcasting, Inc. v. Dukakis, 409 F. Supp. 895 (D. Mass. 1976); Southwestern Newspapers Corp. v. Curtis, 584 S.W.2d 362 (Tex. Civ. App. 1979)).

On appeal, the plaintiff has cited cases from the First, Second, and District of Columbia Circuit Courts of Appeals that consider issues that she believes to be analogous to the issue in this case. See Anderson v. Cryovac, Inc., 805 F.2d 1, 9 (1st Cir. 1986) (holding that a district court could not provide access to certain discovery materials to one newspaper and then deny access to competing newspapers); American Broadcasting Companies v. Cuomo, 570 F.2d 1080, 1083

(2d Cir. 1977) (holding that New York political candidates could not selectively exclude ABC from "public function[s]" -- the primary election events -- while admitting other media representatives); <u>Sherrill</u> v. <u>Knight</u>, 569 F.2d 124, 129 (D.C. Cir. 1977) (holding that, because the White House has established press facilities that are perceived as being open to all bona fide Washington-based journalists, access to those facilities may not be "denied arbitrarily or for less than compelling reasons"). The plaintiff's resort to these out-of-circuit cases merely underscores the lack of Fourth Circuit and Supreme Court law establishing the right for which she contends. Indeed, the fact that plaintiff is forced to rely on these cases-- the facts of which differ markedly from Ringgold's limitations on the manner in which Snyder could access Department information and his refusal to allow her to participate in filming an exclusive report on Department premises -- demonstrates that there is little support for her contentions even in the case law of other circuits.

Moreover, we are not persuaded that Ringgold's decisions to deal with Snyder only in writing (rather than to speak to her directly) and to prohibit her from participating in the filming of exclusive WBFF-TV interviews with Department personnel violate any right that is "manifestly included within more general applications of the core . . . principle[s]" of the First Amendment. <u>Pritchett</u>, 973 F.2d at 314. Plaintiff contends that the "right for a journalist to have equal access to public information sources" and "to be treated the same as other journalists," Appellee's Brief at 23-24, is inherent in the core guarantees of the First Amendment.

The many weaknesses in plaintiff's position are readily apparent. For example, the broad rule for which plaintiff argues would presumably preclude the common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter.* And,

_____

*Plaintiff's rule could not logically extend only to those officials who are specifically designated by the government as the press or public relations agent for a department on the ground that the information they have cannot be obtained elsewhere. Most public officials have information that cannot be accessed through other sources. Indeed, reporters often compete for the prized exclusive interviews precisely because the information revealed in such interviews is not otherwise available.

6

it would preclude the equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments. Additionally, even if the right was somehow limited to situations in which access is provided to a broad spectrum of reporters, the plaintiff's rule would still presumably preclude the White House's practice of allowing only certain reporters to attend White House press conferences, even though space constraints make it impractical to open up the conference to all media organizations. That plaintiff's rule flies in the face of so much well settled practice suggests, at least, that it is not clearly established.

Moreover, the right of "equal access" for which plaintiff argues cannot be limited to members of the media without conferring a privileged First Amendment status on the press, and the Supreme Court has affirmed that the press does not enjoy special First Amendment rights that exceed those of ordinary citizens. See Branzburg v. Hayes, 408 U.S. 665, 684-85 (1972) (noting that the First Amendment "does not guarantee the press a constitutional right of special access to information not available to the public generally"). Consequently, plaintiff's asserted right would require that, in each and every circumstance where the government made news available, it would have to give access to that information to everyone on equal terms. The broad rule for which plaintiff contends thus appears untenable. In any event, the contours of any such right would be difficult to delineate, and certainly cannot be discerned through a straightforward and obvious application of existing First Amendment principles.

Plaintiff also argues that, even if a government agency can favor one reporter over another for "legitimate" reasons, it cannot do so because it likes one reporter's stories better than another's. Plaintiff claims that this more specific right not to have her access to government information sources restricted because of her viewpoint and the content of her stories is an "obvious application" of the core First Amendment principle prohibiting content and viewpoint discrimination. However, it is a large analytical leap from holding that government may not regulate or prohibit private speech on the basis of content or viewpoint to holding that government may not make "content-based" distinctions between reporters in granting access to government information. Indeed, the government can certainly con-

7

trol the content of its own speech in ways it could never regulate or control the content of private speech. See, e.g. , Rust v. Sullivan, 500 U.S. 173 (1991). Arguably, by analogy, the government should be able to choose to limit its audience in a way it could not choose to limit the audience available to private speakers. In any event, it should be apparent that the contours of any right that a reporter has not to be discriminated against in her access to government information based on the content of her prior stories are not "sufficiently clear" that Ringgold -- or any other "reasonable official" -- would have understood that simply restricting the manner in which Snyder could receive Department information and refusing her exclusive interviews on Department premises violated that right. Anderson, 483 U.S. at 640.

Accordingly, the judgment of the district court is

REVERSED.

8