**QUAD–CITY COMMUNITY NEWS
SERVICE, INC., Plaintiff,**

v.

**Hon. John H. JEBENS, Mayor, Davenport, Iowa, et al., Defendants.**
**Civ. No. 4–989–D.**

United States District Court,
S. D. Iowa,
Davenport Division.
Nov. 2, 1971.

Philip J. Mause and Robert Bartels, Iowa City, Iowa, for plaintiff.

Richard A. Larsen, Davenport, Iowa, for defendants.

## MEMORANDUM AND ORDER

HANSON, Chief Judge.

This ruling is predicated upon Plaintiff's respective Motions for preliminary injunctive relief and to waive bond on the preliminary injunction. With the exception of appearing at the hearing on the motions, defendant has not resisted them although given ample opportunity to do so by this Court.

Plaintiff brought this action under the Civil Rights Act, 42 U.S.C., Section 1983, for preliminary and permanent injunctive relief as well as for compensatory and exemplary damages. Plaintiff also sought damages and injunctive relief under the Iowa Public Records Act, Chapter 68A, Code of Iowa 1971. Plaintiff now indicates to the Court that it does not plan to pursue the damage action.

Plaintiff alleges that the defendants have deprived it of the rights of free speech and press, equal protection and due process under law, in violation of the First, Fifth and Fourteenth Amendments of the Constitution of the United States. Plaintiff further alleges that the defendants' actions have violated the Iowa Public Records Act. The Court has original jurisdiction under 28 U.S.C., Section 1343(3).

Plaintiff Quad-City Community News Service, Inc. (hereinafter called Quad-City) was incorporated under the laws of Iowa as a non-profit corporation on May 3, 1971. Quad-City's place of business is at a residential address in the City of Davenport, Iowa. Plaintiff publishes what is popularly known as an "underground" newspaper called CHALLENGE.

Defendants Jebens, Koos and Larsen are respectively the Mayor, Chief of Police, and City Attorney for the City of Davenport, Iowa. They are sued here in their official capacities.

The individual incorporators of Quad-City had commenced publication of

CHALLENGE prior to the Articles of Incorporation being filed, and the corporation is apparently continuing the newspaper's publication on a bi-weekly basis. Circulation of the several issues to date has varied between 600 and 1600, and is currently somewhat over 1000. The bulk of the papers are hawked on the streets of Davenport and adjoining Iowa and Illinois communities. The incorporators and other individuals perform on a voluntary basis the various staff activities of gathering news, writing and editing, printing and assembling, and distributing the newspaper. The duties of the staff members perhaps are less structured than are those of staffs of more orthodox publications as individual members of Quad-City's staff will at various times perform any and all of the tasks of publication. According to the affidavit of Harold Vannier, President of Quad-City, the corporation had total assets on July 16, 1971, of less than Ten Dollars.

Quad-City complains that since May 1, 1971, the defendants have continuously denied Plaintiff's representatives access to the Davenport Police Department files, records and investigative reports, although these items have been readily available to other newspapers and media. Quad-City further complains that it has been denied press passes even though such passes have been issued by the Police Department to the staffs of other media. The Motion for preliminary injunctive relief came before the Court on oral hearing on July 23, 1971.

The parties have stipulated to the following matters:

1) On May 1, 1971, plaintiff's representative, Milton Geffin, was refused access to police files and reports by defendants concerning a group disturbance on Charlotte Street in Davenport on the night of April 30, 1971. TIMES–DEM-OCRAT police reporters were allowed such access.

2) On June 9, 1971, Philip J. Mause, Supervising Attorney, and Larry P. Wilshire, Law Student Intern, H.E.L.P., acting for Quad-City Community News Service, Inc., applied in writing to defendants for a Davenport Police Department press pass and/or access to police files, records or reports available to other newspapers.

3) On June 14, 1971, Larry P. Wilshire, Law Student Intern, H.E.L.P., telephoned Gilbert Koos, Chief of Police, and Richard Larsen, City Attorney, concerning the said application. Both defendants stated that they had received the letter of June 9, 1971, applying for the press pass and/or access to police files, and further stated that the application had been denied. Defendant Richard Larsen stated that the decision would not be available in writing. Neither Koos nor Larsen stated a reason for the denial.

For purposes of preliminary injunctive relief, it appears unnecessary to detail the nature of Quad-City's overwhelming evidence in support of its allegations. The defendants' own case in chief, for which Chief Koos was the only witness, establishes the elements of the Complaint and the basis for granting relief. Chief Koos testified:

1) The Davenport Police Department maintains two books containing records of all arrests (one book lists only traffic offenses; the second includes arrests for all other offenses) upon a counter adjacent to the Shift-Captain's desk. Department policy is that the information within these "Arrest Books" is available to all members of the public.[1]

2) Investigative reports and the various other reports completed by officers following police action are maintained in

---

1. The testimony of Plaintiff's representatives established that, in the course of some 5 to 10 trips to the Davenport police station for the purpose of seeking records concerning certain instances of police action—during which time Plaintiff's representatives sought assistance from Chief Koos and various other officers—the availability of these "arrest books" was never made known to them.

the files known as Miscellaneous Reports or in certain other files. Department policy is that these records are confidential within the meaning of the Iowa Public Records Act, Section 68A.7(5). Accordingly, these records are not available to the public, at least insofar as the public consists of individual private citizens. With very occasional exceptions, however, these reports are available to all members of the press. This latter policy has existed for many years and is designed for the convenience of both the press and the Department, as it alleviates the necessity of calling periodic press conferences. All members of the local press, including radio, television and newspapers are treated equally, but the press collectively is given access to the records which "the public" does not have.

3) The above-described Miscellaneous Reports and other files available to the press have been denied to Quad-City on the basis that the plaintiff is not a "legitimate" or "established" newspaper. Chief Koos felt that Quad-City's presentation of Articles of Incorporation were insufficient to confer the status of an "established" newspaper upon the plaintiff since the latter had no physical facilities and was located at a residential address. The Department has no written policy defining what constitutes or qualifies one to be a member of the "established" press.

4) The function of press cards or press passes is to identify reporters and other members of the press at police and fire lines or barricades and to allow the bearers to pass such lines which are established to safeguard the public on various occasions. Press passes are normally provided upon request of an officer or administrator of a particular medium on behalf of the firm's reporters. Press passes are denied to those who are not members of the legitimate press. No local ordinances or regulations cover the issuance of press passes. Chief Koos (who assumed his present position in April, 1971) is continuing what he understands to have been long-standing Department policy. However, Quad-City's request for press passes was the first such request to be considered by Chief Koos.

5) Following Quad-City's presentation of its Articles of Incorporation, Chief Koos requested the advice of Defendant Larsen, the City Attorney. Larsen orally advised denial of the passes. The City Attorney has not issued any written regulations, guidelines or standards defining what is a newspaper.

6) Chief Koos will not knowingly issue a press pass to a person previously convicted of a felony. Accordingly, he runs a check on local police records if a request is made for issuance of a pass to an individual then unknown to the Police Department. Chief Koos stated that press passes were denied to Quad-City on the further basis that some of the members of the firm had been convicted of a felony.

7) The same confidential and Miscellaneous Reports which were denied to individuals representing Quad-City have been made available to reporters from the "established" media in the community.

The stipulation and Chief Koos' testimony may be viewed in perspective when placed in juxtaposition to the testimony of certain other witnesses. Mathew Paust, a reporter for a local newspaper, the Times Democrat, possesses a press pass issued by the City of Davenport (Plaintiff's Exhibit B). He testified that it was obtained when another Times-Democrat reporter took a list of the paper's reporters to the police station and returned with passes for all. Paust has been covering police news regularly since February, 1971, and has never been asked to present the pass. Furthermore, every file or record for which he has ever asked including the so-called Miscellaneous Reports has been made available to him whether he was preparing a current article or an "update" on a news story which had occurred previously. Mr. Paust further testified that if such reports were not

made available, a considerable hardship would be placed on the working press.

Robert Huber has been a newsman for a local radio station, KSTT, for one year. He does not regularly cover police affairs. He does not possess a press pass and indeed was unaware of their existence until the present action was commenced. Huber testified that he went to the Davenport police station on July 22, 1971, the day prior to the instant Hearing, and asked to see the above-mentioned reports of the Charlotte Street disturbance which had occurred on April 30. He testified that he was not recognized by any officer at the station and was told that the reports were confidential. Huber testified that he then mentioned that he worked for KSTT whereupon the reports were promptly produced without any request for further verification of his identity.

Milton Geffin, a Quad-City staff member testified that he had gone to the police station between five and ten times and had always been refused any report or record requested unless he could produce a press pass. The most recent occasion was also on July 22 when he had requested reports of the same incident which were made available to the witness Huber. Geffin also testified as to several unsuccessful attempts to obtain press passes, on at least one occasion when accompanied by two Aldermen of the City.

Mr. Geffin further testified that he was currently serving a probationary period after pleading guilty in January, 1970, to a charge of possession of marihuana in Los Angeles.

The record is replete that the Davenport Police Department has engaged in discriminatory practice in not allowing Quad-City access to police files which are readily available to other local media, and this Court so finds. It is further apparent, and the Court so finds, that the issuance of press passes bears no relationship to access to the Police Department's records within the station, and that the demands by Defendants and their agents for such passes coupled with their continual refusal to issue either the passes or reasons for denial constituted a deliberate action to prevent Quad-City personnel obtaining access to any Police Department records. These findings shall be entered pursuant to Rule 52, F.R.C.P. The remaining question is to what extent, if any, defendants' conduct may be legally justified.

## ACCESS TO POLICE DEPARTMENT RECORDS

*First Amendment—Freedom of Speech and Press:*

■ The Court is not concerned here with the liberty or right of a newspaper to publish information which it has acquired. See New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). The issue here is whether Plaintiff Quad-City can compel the defendants to release or make available certain information. There is no constitutional right of a newspaper to unrestrained gathering of news. Zemel v. Rusk, 381 U.S. 1, 16–17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). But Plaintiff here is not seeking access to information which is being kept confidential, allegedly to protect the public welfare, but rather is merely seeking the same access as is already enjoyed by other media. In other words, the information has already been made available to the public insofar as other media's reporters are the public's representatives.

■ Defendants may reasonably and perhaps rightly expect that Quad-City will publish interpretations of this information or editorial conclusions which differ vastly from those of other editors. But public officials cannot impede the free exercise of speech or press simply because the content is insulting, disturbing or critical. Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). The First Amendment, said Judge Learned Hand, "presupposes that right conclusions are

more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be folly; but we have staked upon it our all." United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943). See New York Times Co. v. Sullivan, 376 U.S. 254, 269–271, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Supreme Court has repeatedly encouraged a robust and uninhibited discussion of public issues and has consistently protected newspapers from public officials. Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). The scope of the *Near* decision was subsequently reemphasized in *Grosjean* where a unanimous Court wrote:

[We] had occasion in *Near* * *. * to discuss at length the subject in its general aspect. The conclusion there stated is that the object of the constitutional provisions was to prevent previous restraints on publication; and the court was careful *not to limit the protection of the right to any particular way of abridging it.* Liberty of the press within the meaning of the constitutional provision * * * meant "principally although not exclusively, immunity from previous restraints or [from] censorship." [Emphasis added.] 297 U.S. at 249, 56 S.Ct. at 449.

■■ A statute which facially does not run afoul of Constitutional protections, may nevertheless be struck down as an infringement upon First Amendment immunities as a consequence of its interpretation and application. Smith, *supra.* ' Similarly, restraints upon certain forms of expression may be enjoined, although the expression itself may not be constitutionally protected, because the restraints also have the prohibited consequence of posing barriers that inhibit valid expression. Smith, *supra*; Mini Cinema 16 Inc. of Fort Dodge v. Habhab et al., 326 F.Supp. 1162 (N.D.Iowa 1970).

The Davenport Police Department may during various investigations possess information which in the interests of either the general public or a particular individual should not be commonly available because such availability might interfere with the detection or apprehension of a criminal or because it would unnecessarily invade the privacy of innocent third parties. But that sort of situation is a far cry from funneling information to the public through only certain representatives who are considered more responsible because they "cooperate" in presenting what the Department believes to be appropriate.

*Chapter 68A—Iowa Public Records Act:*

Defendant Koos urged that the confidentiality of the Police Department's records is authorized by Section 68A.-7(5), Code of Iowa, 1971.[2] Chapter 68A, known as the Iowa Public Records Act, has not been interpreted by the Iowa Courts in a reported opinion, and the parties herein have brought no case to this Court's attention.

■ The operative section of the Act is 68A.2 which states in part that "Every citizen of Iowa shall have the right to examine all public records and to copy such records, and the news media may publish such records, unless some other provision of the Code expressly limits such right or requires such records to be kept secret or confidential."[3] The

---

2. Section 68A.7(5) provides:
 The following public records shall be kept confidential, unless otherwise ordered by a court, *by the lawful custodian of the records,* or by another person duly authorized to release
 * · * * * *
 5. Peace officers investigative reports, except where disclosure is authorized elsewhere in this Code. [Emphasis added.]

3. Section 68A.5 provides:
 The provisions of this Act and all rights of citizens under this Act may be enforced by mandamus or injunction, whether or not any other remedy is also available.

Court finds nothing in the statute to indicate that any one class of citizens is to be granted privileges over any other class. The defendants' practice of making available investigative records to that class of citizens who are employed by newspapers or the broadcast industry while not permitting access to other citizens is simply unsupported by the language of the statute.

Nor does this Court read the second clause of Section 68A.2 (which authorizes publication) to be either in the disjunctive to the first clause granting citizens the right to examine, nor to otherwise grant news media special rights of examination superior to those rights of other citizens. That clause only insures that what is available for examination may in every case also be published by the media.

Chief Koos' contention that Section 68A.7(5) authorizes him to deny investigative reports to Quad-City reporters must be considered within the context of the above. Chief Koos is the lawful custodian of the records including the investigative reports. He may, pursuant to Section 68A.7(5) keep such reports confidential. But it is beyond the comprehension of the Court how such records may continue to be considered confidential within the meaning of the Act after they have been released to certain members of the public who are employed by various news media.

The practice of *de facto* ruling that reports are not confidential to certain individuals but are "confidential" when sought by others is a continuation of the very abuse that so-called public information acts were designed to alleviate. Those who feel aggrieved by the particular interpretation of, or conclusion drawn from, the record by a medium having access thereto are themselves denied access to the same record from which they may demonstrate other interpretations which should be available to

public consideration. The injury thus occasioned to a particular individual or group may be more severe than if the record were maintained in complete silence.[4]

■ Accordingly, the Court holds that when Defendants have exposed the Police Department investigative reports to persons outside the Department (not including cooperating law enforcement officials), they may no longer withhold the same reports from individuals representing Quad-City on the grounds that such reports are confidential within the meaning of Section 68A.7(5).

*Fourteenth Amendment—Equal Protection of the Law:*

■ Defendants' denial of access by Quad-City to records available to the other media presents an obvious case of denial of equal protection of the law in violation of the Fourteenth Amendment of the federal Constitution. No showing merely of a rational relationship to some colorable state interest suffices to justify a classification between media permitted access to the reports and others which are not so permitted. Any classification which serves to penalize or restrain the exercise of a First Amendment right, unless shown to be necessary to promote a *compelling* governmental interest is unconstitutional. Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The defendants have made no showing of any such compelling interest. In McCoy v. Providence Journal Co., 190 F.2d 760 (1 Cir. 1951), city officials refused access to public records to one newspaper while allowing access to another newspaper. The Court there enjoined the discriminatory practice of city officials.

The fact that access to these investigative reports by other media may be

---

4. The Court does not intimate here that the Police Department or Defendants have attempted to "manage" or distort a particular news story toward any ends of their own or to the detriment of someone else in the community.

subject to the discretion of Chief Koos under Section 68A.7(5) of the Iowa Public Records Act is not controlling upon the issue of equal protection. Quad-City is entitled to the same right of access as other citizens. *Grosjean, supra,* 297 U.S. at 244, 56 S.Ct. 444. Whether this access is denominated a "right" or a "privilege" in the first instance is of no consequence. Sherbert v. Verner, *supra,* 374 U.S. at 404–405, 83 S.Ct. 1790 n. 5; Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460. *Contra,* McCoy, *supra.*

### RIGHT TO ISSUANCE OF PRESS PASSES

*Fourteenth Amendment—Procedural Due Process:*

 It should be noted at the outset that representatives of Quad-City testified they were told that they were being denied access to Police Department files on the alleged ground of not possessing press passes. The testimony of witnesses Paust and Huber, produced by the plaintiff, as well as the testimony of Chief Koos, established that the function of press passes was to provide identification at police and fire lines, and that, with the exception of Quad-City reporters, their possession was not a prerequisite to examination of the Miscellaneous Reports and other files. The Iowa Public Records Act, Chapter 68A, entitles access to records without the possession of any sort of "pass", and otherwise does not concern itself with the issuance of press passes. On this record, the Court must conclude that the right to view public records is completely independent of the right to obtain press passes.

Chief Koos testified at the Hearing that his policy was to deny press passes to persons previously convicted of a felony and that inasmuch as two representatives of Quad-City had prior felony convictions he had refused to issue press passes to Plaintiff. However, this testimony must be balanced with the stipulation that Defendants refused to give Quad-City any reason for the denial; the testimony that Defendants refused to tell Quad-City representatives how the paper could qualify for a press pass; the testimony that other members of the community who attempted to intercede on Quad-City's behalf were either misinformed or received no additional information; and, the testimony of other members of the working press who were unaware of any screening policy on the issuance of press passes. It is apparent that Defendants engaged in a classic example of post-factor rationalization of a preconceived determination to deny Quad-City's application regardless of any objective comparison of the plaintiff's rights with those of other members of the press.

Quad-City does not contend that the defendants have no right to restrict the public from sites of certain types of danger or disturbance or rescue efforts, limiting access to members of the press who will inform the greater populace (accurately, it is hoped) of the respective events. And in the absence of both evidence and law to the contrary, the Court is not about to consider this an unreasonable practice by Defendants. The question of moment is that of the procedures employed by the defendants to determine who qualifies for this role of quasi-representative of the public.

Plaintiff urges that the granting of press passes is analogous to the granting of licenses to use public facilities to express religious and political views. Perhaps this comparison between written and oral expression would be more analogous were the Court here concerned with an attempt to prevent distribution of plaintiff's paper. But the Court cannot ignore that a paper may be prevented from bearing public witness, as much by restricting its access in the first instance to the event as by subsequently restricting distribution of its printed

views.[5] Without the access provided by passes, the press will be limited in these events to information gleaned from the official records, assuming that the press is subsequently granted access to those records. And even when such records are available, there may be no way for the press to fulfill its historic function of providing an independent and perhaps alternative view to the official interpretation.

It must be apparent that where public officials, in making decisions such as here involved, use employ criteria or reasons that are either vague or completely unknown, the party affected has no way of knowing how to achieve compliance with the criteria nor even of challenging them as being improper. In such situations, the public officials literally have unimpeded discretion to regulate the activity in question in whatever manner they desire.

■ Regulation in the area of free expression can only be tolerated when a public official's discretion is guided by narrow and specific standards which advance a compelling state interest. Niemotko v. Maryland, 340 U.S. 268, 71 S. Ct. 325, 95 L.Ed. 267 (1951). And see Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

Chief Koos testified at the Hearing that he did not believe Quad-City qualified as an "established" newspaper. He was unable to elaborate further as to what constituted such a paper. The history of this nation and particularly of the development of many of the institutions of our complex federal system of government has been repeatedly jarred and reshaped by the continuing investigation, reporting and advocacy of independent journalists unaffiliated with major institutions and often with no resource except their wit, persistence, and the crudest of mechanisms for placing words on paper.

■ A standard of "established" could never meet the requirements of specificity enunciated in Niemotko, supra. Whatever standard Defendants employ to license journalists who are to be admitted to sites of newsworthy events must be narrowly drawn, reasonable and definite and they must be publicly available. Furthermore, refusal to timely inform an applicant as to the reasons for denial of a pass, that is, in what respect(s) its application is found deficient according to the standards is as void of due process as is the lack of standards in the first instance.

### Fourteenth Amendment—Equal Protection of the Law:

As stated previously, any classification which serves to penalize or restrain the exercise of a First Amendment right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional. The issue under consideration here is the right of a member of the media to have press passes for its representatives. This differs somewhat from the question of whether a particular individual is entitled to carry a press pass. Thus, it is not impossible for Defendants to devise reasonable standards under which Quad-City, as a member of the press, will be entitled to press passes, but under which certain individuals on Plaintiff's or any member's staff will not be eligible to carry a pass. (For example, Defendants might well devise a standard that, inter alia, denies a pass to a 15-year old employee.) Of course, a person who believes he has been wrongly aggrieved by the policy may bring an individual action. If standards are con-

---

5. The issue of concern is not an absolute right of the press to unfettered gathering of news, that is, the right to unfettered access beyond the police or fire lines. The issue is the procedure by which Quad-City, or any party, qualifies as a member of the press.

trived which effectively deny eligibility to all members of Plaintiff's or any staff, they will undoubtedly be subject to attack by the organization in question on the Equal Protection grounds discussed above.

 It is clear that when Defendants devise the standards to be employed in issuing press passes, they must be applied to all organizations to which passes are issued and not solely to Quad-City's application for the passes. Inasmuch as Defendants have continued to issue press passes to other members of the media and denied passes to Quad-City, Defendants will be enjoined from denying a press pass to all reporters appropriately designated by the President of the Corporation until such time as Defendants have promulgated standards by which applications are to be considered. The Court emphasizes, however, that Defendants shall not be permitted to then revoke passes issued to Quad-City reporters and require reapplication under the new standards unless all outstanding press passes issued by the Police Department are similarly revoked and each and every member of the media are similarly required to reapply under the new standards.

## MOTION TO WAIVE THE PRELIMINARY INJUNCTION BOND

 This cause came on for Hearing on Plaintiff's Motion for preliminary injunction. At the Hearing, the parties stipulated that the issue of permanent injunctive relief would be determined from the same evidence. The Court may advance the trial of the action on the merits and consolidate with the hearing on the application pursuant to Rule 65(a) (2), F.R.C.P. The Court has so Ordered. Inasmuch as the Court today is determining the cause upon the merits, the Motion to waive the preliminary injunction bond is moot.

 Prior to entry of Final Orders, the Court makes one additional finding of fact. At no time have Defendants filed any pleadings, responsive or otherwise. At the close of the Hearing, the Court granted the parties additional time to file any pleadings or briefs and arguments and Defendants again failed to respond. Plaintiff was finally compelled to communicate to the Court its own understanding of Defendants' position upon the issue of relief. The Court has ordered that communication filed as part of the permanent record. The evidence showed that Plaintiffs fully exhausted their remedies outside of the courts to vindicate their constitutional rights before filing this action, and that Plaintiff's attempts included efforts by their counsel, to all of which Defendants showed no inclination to respond, with the exception of making the statement that they would not give any reasons for their actions. The Court finds that Defendants' actions in dealing with Plaintiff were deliberate and without any hope or anticipation of prevailing on the merits. The Court will therefore award Plaintiff the costs incurred in this action plus attorneys' fees. Clark, et al. v. Board of Education, 449 F.2d 493 (8 Cir. 1971).

Accordingly, it is ordered that the defendants, their agents, servants, employees, attorneys and successors, and all persons in active concert and participation with them, be and hereby are permanently restrained and enjoined from denying to Plaintiff's reporters and representatives access to all Davenport Police Department files, records, and reports available to other citizens of Iowa, newspapers and news media including but not limited to:

a. Records of current and prior arrests

b. Police investigative reports, specifically:

1) investigative report on a civil disturbance on Charlotte Street in Davenport on the night of April 30, 1971;

2) investigative report on the shooting of a 16 year old boy by a Davenport police officer on the night of May 26, 1971;

3) investigative report concerning a civil disturbance on 6th and Vine Streets on Saturday, July 17, 1971;

4) investigative report concerning a drug arrest of Ploug and O'Donnell on Friday, July 16, 1971;

5) investigative report concerning extortion charges involving the West End Protective Association on July 20, 1971.

It is further ordered that the defendants, their agents, servants, employees, attorneys and successors, and all persons in active concert and participation with them, be and hereby are restrained and enjoined from denying a Davenport Police Department Press Pass to all reporters of the Quad-City Community News Service, Inc designated as such by the president of said Corporation until such time as Defendants have caused to be promulgated publicly-available standards by which all applications for such Press Passes are to be evaluated; and at such time the defendants, their agents, servants, employees, attorneys and successors, and all persons in active concert and participation with them shall continue to be restrained and enjoined from revoking Press Passes then issued to Plaintiff's reporters in the absence of revoking all Press Passes of all representatives of the press theretofore issued.

It is further ordered that Defendants shall accord to Plaintiff and its representatives all other rights, privileges and courtesies given to another member of the news media.

It is further ordered that Defendants shall pay to Plaintiff any court costs incurred in this action.

It is further ordered that Defendants shall pay to Plaintiff attorneys' fees in the amount of One Hundred Fifty Dollars ($150.00).