GETTY IMAGES NEWS SERVICES,
CORP., Plaintiff,

v.

DEPARTMENT OF DEFENSE,
et al., Defendants.

No. CIV.A. 02–0171JDB.

United States District Court,
District of Columbia.

March 7, 2002.

Joshua Jacob Kaufman, Washington, DC, for plaintiff.

Henry A. Azar, Jr., U.S. Department of Justice, Federal Programs Branch, Washington, DC, for defendants.

### *MEMORANDUM OPINION*

BATES, District Judge.

Plaintiff Getty Images News Services, Corp. ("Getty") has raised a First Amendment and equal protection challenge to the alleged exclusion of Getty by the Department of Defense and other defendants (collectively "DOD") from full and fair participation in press coverage of Operation Enduring Freedom. Getty is a reputable press organization that produces over 100,-000 photographs annually for subscribers such as *Time* and *Newsweek.* It has moved for a preliminary injunction seeking (1) to enjoin DOD from continuing to exclude it from participation in the DOD National Media Pool; (2) to enjoin DOD from continuing to exclude it from participation in any ad hoc (or regional) pools [1] created during Operation Enduring Free-

1. The term "pool" denotes a setting in which a limited number of journalists are allowed access to an arena and permitted to accompany U.S. troops, and agree to share their work with other news organizations in the pool.

dom, including the regional pool for Afghanistan; and (3) to enjoin DOD to provide it with equal access (and to require DOD to promulgate standards and procedures ensuring equal access) to the detention activities at Guantanamo Bay Naval Base. DOD has moved to dismiss Getty's claims concerning alleged exclusion from the National Media Pool and the Afghanistan regional pool for lack of jurisdiction. For the reasons stated below, Getty's motion for a preliminary injunction is denied and DOD's partial motion to dismiss is granted.[2]

## Factual Background

The factual scenario presented to the Court has evolved considerably since Getty commenced this litigation on January 31, 2002. Initially, in its Complaint and accompanying motion for a temporary restraining order and preliminary injunction, Getty alleged that during Operation Enduring Freedom, DOD had established and utilized a DOD National Media Pool and ad hoc pools in Afghanistan and Guantanamo Bay to regulate press access to ongoing military operations. Getty contended that it had been excluded from the National Media Pool and the ad hoc pools without justification, and that it had been denied receipt of the work product of those pools by pool members (who are Getty's competitors) acting under DOD authorization. Getty described lengthy communications between it and DOD officials from late November 2001 through January 2002 illustrating that, while DOD had not expressly rejected Getty's attempts to secure membership in the National Media Pool and the ad hoc pools, DOD had effectively denied Getty such membership by failing to respond to Getty's repeated inquiries.

One of the specific challenges raised by Getty was the alleged failure of DOD to include Getty among press representatives flown to Guantanamo Bay to cover the detention operations there. Getty alleged that it had not been included in an ad hoc pool established at Guantanamo Bay and that it had been denied the products of the visits to Guantanamo Bay by its competitors who had been granted access. Getty alleged that DOD had failed to establish adequate rules and procedures covering the creation and operation of the press operations for Guantanamo Bay and elsewhere.

Getty framed several constitutional challenges to its alleged treatment by DOD. Getty claimed that DOD's actions constituted violations of: (a) Getty's First Amendment right to equal access; (b) Getty's Fifth Amendment right to equal protection; (c) Getty's First and Fifth Amendment rights because adequate regulatory standards had not been developed and applied; and (d) Getty's due process rights under the Fifth Amendment because Getty's competitors had allegedly been delegated the power to regulate Getty's access to pool coverage.

In opposing Getty's motion for a temporary restraining order, DOD demonstrated that the facts alleged in Getty's Complaint and motions were inaccurate. DOD explained that the National Media Pool had not been activated during the course of Operation Enduring Freedom. Declaration of Timothy Taylor ¶ 4 (executed on February 6, 2002). DOD also represented that the regional media pool set up in connection with operations in Afghanistan had been discontinued in December 2001, and that no other regional or ad hoc media pool was in operation or planned. Since late December 2001, DOD stated, the media has been able to provide open, inde-

---

2. After conferring with the parties, the Court has established an expedited schedule for final resolution of the remaining claims in this matter, including an accelerated schedule for discovery and briefing of dispositive motions.

pendent news coverage in Afghanistan. Taylor Dec. ¶ 4. DOD also submitted an internal memorandum containing detailed procedures and rules for administering the National Media Pool, including a list of criteria for pool membership. Taylor Dec. Exhibit 1.

In addition, DOD addressed Getty's alleged exclusion from access to Guantanamo Bay, a United States military base accessible only by military transport. DOD explained that no pool was in effect for Guantanamo Bay and that news organizations were being allowed to provide independent coverage.[3] Taylor Dec. ¶ 6. DOD further stated that because of the limited physical access to Guantanamo Bay, DOD was coordinating a rotation of news media representatives. Taylor Dec. ¶ 5. As of February 6, 2002, seven flights to Guantanamo Bay had transported approximately twenty news media representatives per flight. Taylor Dec. ¶ 5. DOD explained that, in allocating space on flights to Guantanamo Bay, the responsible military command was attempting to provide a mix of media, with emphasis on those media organizations reaching a broad audience. Taylor Dec. ¶ 7 & Exhibit 3. Moreover, DOD represented that a Getty representative was on the February 6 flight to Guantanamo Bay, and was scheduled to remain there until February 8. Taylor Dec. ¶ 7.

In a Memorandum Opinion issued February 8, 2002, the Court denied Getty's motion for a temporary restraining order. The Court noted that, in light of the facts that the media pools that Getty was challenging were not operational and that Getty had been placed on a flight to Guantanamo Bay, Getty had not demonstrated immediate irreparable injury that warranted an injunction pending the expedited resolution of Getty's motion for a preliminary injunction.[4]

Following the Court's denial of Getty's motion for a temporary restraining order, the facts evolved further. At the preliminary injunction hearing on February 21, 2002, counsel informed the Court that Getty had been granted membership in the National Media Pool the previous day. DOD also informed the Court that media flights were traveling to Guantanamo Bay at a rate of about two per week, and that to date approximately 300 media organizations had expressed an interest in going to Guantanamo Bay. At the hearing, DOD articulated four principles that guide the allocation of space on the media flights to Guantanamo Bay: (1) DOD seeks a mix of media types (e.g., television, print, radio, wire services) on the flights; (2) DOD gives some preference to media organizations that consistently reach large audiences; (3) DOD seeks to send international media organizations because the government has an interest in reaching a worldwide audience in matters concerning the war on terrorism; and (4) DOD seeks to send regional news media because the detention activities at Guantanamo Bay are, in part, a regional news story.[5] Although DOD had not revealed the latter two criteria in its written submissions to the Court, DOD represented at the hear-

---

3. DOD noted that the very first flight to Guantanamo Bay was scheduled on the basis that media representatives were to provide independent coverage, but that this group was converted to a pool because the representatives extended their stay in order to cover the arrival of the first detainees. Taylor Dec. ¶ 6. Since that initial flight, all flights have been on the basis of independent coverage. *Id.*

4. Getty had specifically limited its claim of irreparable harm to the alleged deprivation of constitutional rights relating to access to Guantanamo Bay.

5. By way of example, DOD pointed out that the *Miami Herald* has been given some preference because its readers include a large number of Cuban immigrants.

ing that all four criteria, and only those four criteria, had been used in allocating media space for flights to Guantanamo Bay since the commencement of the flights in early January 2002. DOD conceded that neither the four criteria nor any other standards for allocating access to Guantanamo Bay are written or published. DOD also conceded that there are no formal procedures by which DOD gathers information relevant to the evaluation of a particular media organization under these criteria. Rather, DOD explained, decisions are generally made by a DOD Public Affairs Officer based upon his general knowledge and expertise in public affairs and, occasionally, based upon information received through informal inquiries of media organizations.

## I. DOD's Motion to Dismiss

DOD has moved to dismiss Getty's claims challenging its alleged exclusion from the National Media Pool and the Afghanistan regional media pool on the basis that Getty lacks standing.[6] The standing doctrine, of course, derives from the constitutional requirement that federal courts may only adjudicate actual "cases" and "controversies." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). In order to bring a case in federal court, a plaintiff bears the burden of establishing the three elements of standing:

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct

complained of—the injury has to be fairly ... traceable to the challenged action of the defendant, and not ... the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotations and citation omitted).

■ With respect to Getty's challenge to its alleged exclusion from the National Media Pool, it is clear that Getty does not have standing. Prior to the hearing on the preliminary injunction, Getty was granted the principal relief it had sought—membership in the National Media Pool. Moreover, the National Media Pool was never activated between the time that Getty first made efforts to apply to the National Media Pool and the time that Getty was accepted into the pool. Consequently, Getty cannot demonstrate that it suffered an "injury in fact" because of any alleged delay by DOD in reviewing Getty's application to the National Media Pool, and nothing this Court could do would redress the injury Getty claimed—exclusion from the National Media Pool—now that Getty has been admitted.

■ So, too, Getty's claims with respect to its alleged exclusion from the National Media pool are effectively moot. In order for a case to be justiciable, " 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.' " *Fraternal Order of Police, D.C. v. Rubin,* 134 F.Supp.2d 39, 41 (D.D.C.2001) (quoting *Arizonans for Offi-*

---

**6.** DOD also initially moved to dismiss Getty's claims challenging its alleged exclusion from the National Media Pool on the basis that Getty's claims were not yet ripe because Getty had not submitted a complete application and

DOD had not yet ruled on Getty's application. Because DOD has now granted Getty's application, DOD's ripeness arguments have been obviated.

*cial English v. Arizona*, 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)). Because Getty has been admitted into the National Media Pool and does not appear to be pressing any challenge to the policies governing the National Media Pool, there is no longer an actual controversy warranting the Court's intervention.

■ Getty also lacks standing to challenge its alleged exclusion from the regional pool created for Afghanistan. Even assuming that Getty suffered an "injury in fact" because DOD failed to act on Getty's requests for membership during the short window between when Getty first inquired about the pool in late November 2001 and the time that the pool was discontinued in December 2001, the Court cannot provide relief that will redress any wrong that may have occurred. The Afghanistan regional pool no longer exists and there is nothing to indicate that it will be established again (and that Getty would be excluded from it). Accordingly, there is no injunctive relief the Court can provide that would remedy any alleged injury with respect to the Afghanistan regional pool. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 109, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Because respondent alleges only past infractions of [the statute], and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury.").

■ For similar reasons, the issues concerning the now-defunct Afghanistan regional pool are moot. *See Conyers v. Reagan*, 765 F.2d 1124, 1127 (D.C.Cir.1985) (action by Congressmen challenging the constitutionality of the military's invasion of Grenada was moot because the invasion had already occurred and could not be

undone); *Flynt v. Weinberger*, 762 F.2d 134, 135 (D.C.Cir.1985) (action by publisher challenging the constitutionality of the military's press ban in Grenada was moot since press ban had been lifted); *Nation Magazine v. United States Dep't of Defense*, 762 F.Supp. 1558, 1570 (S.D.N.Y. 1991) (plaintiffs' claim to enjoin DOD from using pools was moot because pooling regulations at issue had been lifted). Although Getty suggests that the regional pool in Afghanistan is "capable of repetition, yet evading review," there is no "reasonable expectation" that the regional pool in Afghanistan will be re-established now that open media access has become possible, much less reason to believe that any future regional pool would exist in Afghanistan for such a short duration as to preclude adjudication. *See Conyers*, 765 F.2d at 1128–29 (mootness exception did not apply to military action in Grenada because wars are not inherently short in duration); *Flynt*, 762 F.2d at 135 (after press ban had been lifted in Grenada, there was no "reasonable expectation" that controversy would recur).[7]

■ Moreover, to the extent that Getty seeks an injunction with respect to regional pools outside of Afghanistan that may be established in the future—or, for that matter, with respect to future military situations (other than at Guantanamo Bay) in which DOD might restrict access without establishing a pool—Getty's claim is entirely too speculative to provide a basis for relief under both standing and ripeness analyses. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (standing requires an "injury in fact" that is "actual or imminent, not 'conjectural or hypothetical'" (citations omit-

---

**7.** The fact that Getty also seeks a declaratory judgment that DOD's conduct violates Getty's constitutional rights does not save Getty's claim. In the absence of an existing or anticipated regional pool, Getty's claim is "no longer part of a controversy of 'sufficient immediacy and reality to warrant declaratory relief.'" *Conyers*, 765 F.2d at 1128 (quoting *Preiser v. Newkirk*, 422 U.S. 395, 402, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975)).

ted)); *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"). While the Court recognizes that Operation Enduring Freedom is continuing and that restricted media access situations could conceivably arise in the future, the Court has no jurisdiction to adjudicate hypothetical disputes in which the specifics of the challenged policies, the relevant factual context, and even the identify of the injured plaintiff are a matter of conjecture. Indeed, the absence of a concrete controversy is of particular concern in light of the important constitutional issues at stake and the national defense interests that might be implicated. *See Nation Magazine,* 762 F.Supp. at 1575 (declining to exercise jurisdiction in the absence of a well-focused controversy, even though challenge to constitutionality of terminated pooling regulations was not moot).

Accordingly, DOD's motion to dismiss is granted. Getty's claims concerning the National Media Pool, the Afghanistan regional pool, and future restricted media access situations (other than at Guantanamo Bay) are dismissed.

## II. Getty's Motion for a Preliminary Injunction

■ DOD has not moved to dismiss Getty's claims concerning the alleged denial of equal access to the detention facilities at Guantanamo Bay. In order to prevail on its motion for a preliminary injunction, Getty must demonstrate (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable harm absent the relief requested; (3) that other parties will not be harmed if the relief is granted; and (4) that the public interest supports granting the requested relief. *Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1505–06 (D.C.Cir.1995); *Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977). "Injunctive relief is an extraordinary remedy, and the party seeking it bears a substantial burden." *Search v. Pena,* No. 95–1289(SSH), 1995 WL 669235 at *2 (D.D.C. July 31, 1995); *see also Marine Transport Lines, Inc. v. Lehman,* 623 F.Supp. 330, 334 (D.D.C.1985) ("The grant of a preliminary injunction is a drastic and unusual measure ... and absent a strong showing of need, it need not be granted.").

### A. Likelihood of Success on the Merits

Getty alleges that DOD's allocation of media slots on flights to Guantanamo Bay does not comport with the requirements of the First and Fifth Amendments. Although Getty recognizes that practical considerations limit DOD's ability to grant every media organization the degree of access that it might want, Getty nonetheless argues that once DOD opened Guantanamo Bay to certain members of the press, all members of the press became constitutionally entitled to equal access to the detention facilities there. *See Nation Magazine,* 762 F.Supp. at 1573 ("Regardless of whether the government is constitutionally required to open the battlefield to the press ... once it does so it is bound to do so in a non-discriminatory manner."). Getty asserts that DOD's current method for selecting which media organizations go to Guantanamo Bay is arbitrary and capricious because DOD does not publish guidelines concerning the selection criteria it uses, makes selection decisions based on DOD's "own limited and biased perceptions of the news media organizations requesting access," and maintains the ability to reject media organizations without any reasonable explanation and without review. Getty Reply Brief at 9. Moreover, Getty argues, whenever DOD restricts the number of media personnel it allows to cover

news events in areas under its control, DOD is constitutionally required to set up a pool. Based on the foregoing allegations, Getty seeks an injunction requiring DOD to set up pools for areas where it restricts media access and requiring equal treatment for Getty and other members of the press.[8] Getty Reply Brief at 1.

■ In responding to Getty's allegations, DOD highlights the principle that "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). DOD argues that a military base like Guantanamo Bay is not a public forum. Accordingly, restrictions on access must be upheld so long as they are reasonable, and here, DOD contends, its selection of media organizations competing for limited military resources is reasonable. DOD asserts that it "need not generate written standards every time media interest in an event on a military base outstrips the logistical support that the military can simultaneously provide the media." DOD's Memorandum in Opposition to Motion for Preliminary Injunction at 34. DOD further argues that it is not of a constitutional dimension whether a Getty representative flies to Guantanamo Bay once a week or once a month under the application of DOD's policy.

The Court agrees both that the Guantanamo Bay Naval Base is not a public forum and that consideration of Getty's First and Fifth Amendment claims must be undertaken through the prism of the heightened deference due to military regulations and decision-making. Nonetheless, equal

access claims by the press warrant careful judicial scrutiny.

Both parties direct the Court's attention to *Sherrill v. Knight,* 569 F.2d 124 (D.C.Cir.1977). There, this Circuit considered an appeal by a reporter who had been denied a press pass to the White House. The determination as to whether to issue a pass depended entirely upon the recommendation of the Secret Service but there were no published or internal regulations stating the governing criteria. *Id.* at 126–27. A rejected applicant would be informed that the denial was for reasons relating to the security of the President or his family, but the factual basis for the denial would not be revealed. *Id.* at 127.

The Court of Appeals noted that both the First and Fifth Amendments were "heavily implicated" in the case. *Id.* at 128. The court emphasized that the White House had voluntarily established press facilities for correspondents, and held that:

> White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press requires that this access not be denied arbitrarily or for less than compelling reasons. Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information.

*Id.* at 129–30.

Acknowledging that the protection of the President was a compelling interest

---

**8.** As discussed above, the Court finds that Getty's claims regarding restricted access situations that may arise in the future present issues that are too speculative to be justicia-ble. Accordingly, the Court will treat Getty's request for an injunction as limited to the detention activities at Guantanamo Bay.

that could justify the refusal to issue a press pass, the court also recognized that an interest in the President's security did not lend itself to "detailed articulation of narrow and specific standards or precise identification of all the factors which may be taken into account in applying [the] standard." *Id.* at 130. The court noted that an appropriate standard should "specify in a meaningful way the basis upon which persons will be deemed security risks, and . . . allow meaningful judicial review of decisions to deny press passes." *Id.* The court held that the actual standard employed by the Secret Service should be published or otherwise publicly made known, and that merely informing individuals that they had been rejected for "reasons of security" did not adequately inform the public or other potential applicants of the basis for exclusion. *Id.* Finally, the court held that an unsuccessful applicant should be given notice of the factual basis for denial with an opportunity to rebut and a written final decision. *Id.* at 131.

This Court is cognizant of the factual differences between the instant case and *Sherrill.* This is not a situation in which the government has opened a civilian facility for permanent accommodation of journalists engaged in day-to-day reporting of the President. Rather, the Guantanamo Bay Naval Base is a closed military base located on an island to which no commercial American flights are available, and it is only temporarily dedicated to the detention of individuals, including alleged terrorists, captured during military operations. While DOD has deemed it appropriate to allow press access for independent coverage at Guantanamo Bay, access is necessarily limited by the logistical support and resources that the military can provide. Indeed, the fact that space is limited and that DOD must allocate that space among numerous media organizations is not challenged by Getty.

■ But even DOD concedes that in allocating limited space for media coverage, it must make selections in a manner that is reasonable. *See Nation Magazine,* 762 F.Supp. at 1575 (government must act in a non-discriminatory manner in regulating access to battlefield; in the context of a military operation, DOD may place "reasonable time, place, and manner restrictions on the press upon showing that there is a significant governmental interest"); *see also Sherrill,* 569 F.2d at 130 (individual newsmen may not be arbitrarily denied access to White House press facilities); *Frank v. Herter,* 269 F.2d 245, 247–48 (D.C.Cir.1959) (Burger, J., concurring) (government's selection of correspondents to travel to China may not be discriminatory and the basis for the selection must bear a rational relationship to the ends to be served). Here, the Court is concerned about DOD's standards and methods for choosing which media organizations are placed on flights to Guantanamo Bay.

DOD has now articulated four guidelines used in selecting the media organizations for the flights: need for a mix of media; preference for media organizations that consistently reach a large audience; interest in participation by international news media; and interest in participation by regional news media. The Court believes that these criteria may well be reasonable and may provide a sufficient core for a policy of deciding how often particular media organizations get to travel to Guantanamo Bay. But these criteria are not written or published or in any way made known to the media organizations seeking access. Indeed, until the February 21 hearing on Getty's motion for a preliminary injunction, DOD had not informed either Getty or the Court that DOD may give a preference to international and regional media organizations. Moreover, DOD admittedly has no procedures in place for gathering or receiving informa-

tion that might be relevant in determining how particular media organizations measure up to its criteria. Rather, it relies upon the general knowledge and expertise of a DOD Public Affairs Officer in making assessments, apparently only occasionally asking questions of an organization when the Public Affairs Officer is unfamiliar with that organization. For example, DOD did not ask Getty whether it consistently reaches large audiences or for information about the typical size of Getty's audience before making an assessment as to whether Getty satisfies DOD's "consistently large audience" criterion. However, it appears that Getty's access to Guantanamo Bay has been limited by DOD's assessment that Getty does not consistently reach large audiences. *See* Taylor Dec. ¶ 7.

At this point, then, the Court is not yet convinced that DOD's decision-making is, in fact, reasonable. Although the Court is reluctant to interfere significantly in the military's conduct of its affairs, the First and Fifth Amendments seem to require, at a minimum, that before determining which media organizations receive the limited access available, DOD must not only have some criteria to guide its determinations, but must have a reasonable way of assessing whether the criteria are met. The sensible way to gather this information and to satisfy the due process concerns implicated by restrictions on First Amendment rights is to publish (i.e., make available to potentially interested parties in writing or otherwise) the criteria used in DOD's selection process and provide a way for applicant media organizations to submit information demonstrating that they satisfy the criteria. *See Sherrill*, 569 F.2d at 130 (standard used to determine if journalist should be granted a press pass must be published or made publicly known); *Quad–City Community News Service, Inc. v. Jebens*, 334 F.Supp. 8, 17 (S.D.Iowa 1971) ("where public officials . . . employ

criteria that are either vague or completely unknown, the party affected has no way of knowing how to achieve compliance with the criteria nor even of challenging them as being improper."). With such information, DOD would be able to conduct a reasoned evaluation of media organizations under clear governing criteria. DOD's current approach, which involves making determinations about, *inter alia*, the relative audience sizes of media organizations based primarily upon the general knowledge of a DOD official without any published criteria or process for obtaining relevant information, strikes the Court as somewhat short of "reasonable."

DOD urges, however, that it would not be feasible for DOD to establish highly specific standards every time that DOD has to restrict access during a military operation. Such operations are, DOD notes, often limited in duration and ever-changing in nature. Indeed, even in *Sherrill*, where similar exigencies were not in play, the court was reluctant to require detailed written standards. *See* 569 F.2d at 130.

Both the validity of DOD's concerns and the need for the judiciary to proceed cautiously when intervening in military affairs are obvious. *See Orloff v. Willoughby*, 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953) ("Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."). However, in light of the ruling on DOD's motion to dismiss, the Court is not faced with challenges to hypothetical future military operations, but rather need address only a specific complaint about media access to detention activities at a U.S. naval base that have been going on for approximately two months and are likely to continue into the foreseeable future. Even under the expedited

scheduling order in this case, the detention activities (if still in effect) will have continued for over six months by the time the Court issues a final decision on the merits of this dispute. DOD conceded at argument, by way of example, that if the detention operations at Guantanamo Bay were to continue for a year, DOD would probably need to implement more formal procedures concerning media access. There is no obvious rational explanation why that would not similarly be true after six or nine months. In this regard, the situation at Guantanamo Bay does not seem to present the same set of challenges that more temporary and mercurial military operations might.

Moreover, with respect to DOD's concerns about the specificity of required standards, it is certainly true that in the present case, perhaps even more so than in *Sherrill*, "detailed articulation of narrow and specific standards or precise identification of all the factors which may be taken into account in applying [the] standard[s]" may not be feasible or appropriate. *Sherrill*, 569 F.2d at 130. Because no injunction will issue at this time, however, there is no need to elaborate on the precise parameters of equal access standards and procedures that may be required by the Constitution.

■ Although the Court finds a likelihood of success on Getty's claim that published equal access standards and more formal procedures are required, at least at some point in time, the Court is skeptical of Getty's assertion that the military must create a pool for press access at Guantanamo Bay. In support of its position, Getty cites cases for the proposition that when press access is granted to some, others have a constitutional right to equal access. *See Am. Broad. Cos., Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir.1977); *Westinghouse Broad. Co., Inc. v. Dukakis*, 409 F.Supp. 895, 896 (D.Mass.1976); *Quad–*

*City*, 334 F.Supp. at 18. In none of these cases, however, did the court require that the government create a pool in which journalists who were granted access were required to share their work with journalists who did not have access. Instead, in each case, the court merely held that particular journalists could not be singled out for exclusion but rather were entitled to access on the same terms as other journalists. *See Am. Broad. Cos.*, 570 F.2d at 1083 (once NBC and CBS were invited to cover a mayoral debate, ABC could not be excluded); *Westinghouse Broad. Co.*, 409 F.Supp. at 897 (journalists from one television station were entitled to use special facilities made available at a city council meeting to journalists from other stations); *Quad–City*, 334 F.Supp. at 18 (when government devises standards to be employed in issuing press passes, the standards must be applied to all organizations that apply for passes). No persuasive judicial precedent requiring pool coverage has been cited, and, in light of the unique military context present here, the Court does not believe that the Constitution requires the establishment of a press pool at Guantanamo Bay.

### B. Irreparable Harm

■ The second factor to be considered on a motion for a preliminary injunction is whether a plaintiff will suffer irreparable injury if the injunction is not granted. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C.Cir.1995). It is axiomatic that speculative injury will not support emergency injunctive relief, and that the threat of irreparable injury must be real and imminent. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985). The absence of at least "some injury" is a sufficient basis for denying a motion for a preliminary injunction. *CityFed Fin. Corp.*, 58 F.3d at 747.

Here, the Court cannot conclude that Getty will be irreparably harmed pending expedited resolution of this case. Getty asserts that " '[w]here deprivations of First Amendment freedoms are involved, irreparable injury is presumed,' " citing *Borreca v. Fasi*, 369 F.Supp. 906, 911 (D.Haw.1974). That abstract principle must be applied to the relevant factual setting, however. Consonant with Getty's equal access claim, Getty only suffers actual harm with respect to Guantanamo Bay to the extent that it is allowed to travel to Guantanamo Bay less often under the current access policy than it would under alternative DOD procedures providing for equal access.[9] At this time, the nature of an equal access regime that would serve as the benchmark for measuring any deprivation of Getty's First Amendment rights— and the allocation of media slots to Getty and others under that regime—remains uncertain. Moreover, neither Getty nor DOD has provided the Court with guidance as to how often Getty might be expected to travel to Guantanamo Bay in the coming weeks and months under the current regime.[10] Accordingly, it is unclear whether Getty would actually travel to Guantanamo Bay more frequently under any hypothetical "equal access" regime than it will under the current system. The extent of the actual deprivation of Getty's

First Amendment rights is thus entirely speculative.[11]

To the extent that Getty claims irreparable harm because there is no pool at Guantanamo Bay, that claim is insufficient. As noted above, the Court is not persuaded that the Constitution requires the establishment of a pool in the present circumstances. Consequently, the absence of a pool does not constitute an infringement of First Amendment rights that amounts to irreparable injury.

### C. Harm to Other Parties

The third consideration on a motion for a preliminary injunction is whether other parties will be harmed if the requested relief is granted. Here, it appears likely that at least some third parties would be adversely impacted if the injunction Getty seeks were issued. As DOD points out, the Court is presented with a "zero sum" situation: there is only one way to get to Guantanamo Bay (military flights), and there are a finite number of flights and spaces. If the injunction Getty seeks results in Getty traveling to Guantanamo Bay more often, it necessarily results in fewer trips to Guantanamo Bay by other organizations. There is no reason to think that the harm to those organizations that might travel less often as a result of the

---

**9.** In support of its claim for irreparable harm, Getty also relies upon *Reuters Ltd. v. United Press Int'l*, 903 F.2d 904 (2d Cir.1990). In that case, the Second Circuit found that the plaintiff wire service would be irreparably harmed if the defendant ceased supplying it with photographs. *Id.* at 908. But unlike the plaintiff in *Reuters*, Getty has made no showing that its reputation and customer relations are being irreparably harmed by its alleged inability to secure equal access to Guantanamo Bay.

**10.** The only representations before the Court are that approximately 300 media organizations have requested access, one or two flights with twenty media representatives are made

each week, and perhaps 12 to 15 distinct media organizations are on each flight. If so, a completely random equal access policy would mean Getty would only be on a flight to Guantanamo Bay once every 10 weeks. In the first five weeks of flights, under current DOD criteria, Getty was actually included once; when it will again be included under the current standards is not known.

**11.** Of course, the absence of any concrete deprivation of Getty's First Amendment rights also casts some doubt both on Getty's standing to raise an as-applied challenge to DOD's current policy at Guantanamo Bay and (accordingly) on Getty's likelihood of success on the merits.

requested injunction is quantitatively different than the alleged harm to Getty in the absence of an injunction.

Certain third parties would likely also be harmed if the Court were to grant Getty's request that a pool be established at Guantanamo Bay. Under the current system, the media organizations that travel to Guantanamo Bay during a given time period have the right to publish and distribute their work product as they see fit; in media terminology, they have "exclusives" during the window when they are in Guantanamo Bay. Under a pooling arrangement, the organizations in Guantanamo Bay on a particular day would have to share their work with others in the pool. Consequently, certain organizations that benefit under the current regime might be less well-off under a pooling regime.

### D.  The Public Interest

The final factor the Court must consider is the public interest.  As an initial matter, it is clear that the public has primary interests in the smooth operation of the detention activities occurring at Guantanamo Bay and in the proper and orderly operation of a military facility.  The Court has some concern that requiring DOD to establish a different access system and to coordinate a pool might force DOD to divert its resources and attention away from the military functions at Guantanamo Bay. Moreover, while Getty suggests that the public is being deprived of Getty's photographs, it has not shown that it would actually travel to Guantanamo Bay more frequently under an equal access regime or that the public is being so ill-served by DOD's current system that an injunction is warranted pending final resolution of this matter.[12]  In short, absent some concrete and irreparable diminution of First Amendment rights—which the Court has not found—it is not possible to conclude that the public interest favors the injunctive relief Getty seeks.

### E.  Balancing the Factors

In determining whether to grant a preliminary injunction, the Court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp.*, 58 F.3d at 747.  "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.*

Here, the Court is persuaded that Getty has raised a serious question on the merits relating to its request for equal press access to Guantanamo Bay, particularly with regard to the absence of clear standards and procedures.  The Court is persuaded that Getty is likely to succeed on the claim that, at some point in time, published criteria and a process for obtaining relevant information must be in place to govern media access to ongoing detention activities at Guantanamo Bay. Getty's likelihood of success on the merits, however, cannot be characterized as "strong."  The Court does not believe, for instance, that the Constitution requires the establishment of a press pool.  Moreover, the balance of harms clearly weighs against granting a preliminary injunction at this time with respect to either Getty's request for equal access procedures or its request for a pool, especially given the speculative nature of any actual harm to Getty as measured by the frequency of its inclusion on flights to Guantanamo Bay. Accordingly, Getty has failed to meet its burden of demonstrating that injunctive relief is warranted at this time.

---

12.  Getty has not, for instance, alleged that DOD is engaging in content or viewpoint discrimination and thus depriving the public of certain perspectives on the activities in Guantanamo Bay.

## Conclusion

For the reasons discussed in Part I, DOD's motion to dismiss is granted, and Getty's claims concerning the National Media Pool, the Afghanistan regional pool, and any future restricted media access situations (other than at Guantanamo Bay) are dismissed.

For the reasons discussed in Part II, Getty's motion for a preliminary injunction is denied and this case shall proceed according to the expedited schedule ordered by the Court upon agreement of the parties.

A separate order has been issued on this date.