Maria SANTILLAN, et al., on behalf of themselves and others similarly situated, Plaintiffs,

v.

Alberto R. GONZALES, Attorney General of the United States; Michael Chertoff, Secretary of the Department of Homeland Security; The United States Citizenship and Immigration Services (USCIS); Eduardo Aguirre, Jr., USCIS Director; David Still, USCIS San Francisco District Director, Defendants.

No. C 04–2686 MHP.

United States District Court, N.D. California.

Aug. 24, 2005.

David Anton Armendariz, Javier Nyrup Maldonado, Lawyers' Committee for Civil Rights Under Law of Texas, San Antonio, TX, John C. Dwyer, Maureen P. Alger, Michelle S. Rhyu, Reuben Ho–Yen Chen, Cooley Godward LLP, Palo Alto, CA, for Plaintiffs.

Edward A. Olsen, United States Attorney's Office, San Francisco, CA, Elizabeth J. Stevens, U.S. Department of Justice, Washington, DC, for Defendants.

### *MEMORANDUM AND ORDER*

PATEL, District Judge.

Plaintiffs Maria Santillan, et al. represent a class of persons who have been or will be granted lawful permanent resident status by the Justice Department's Executive Office of Immigration Review and to whom the United States Citizenship and Immigration Services has failed to issue evidence of status as a lawful permanent resident. Following this court's denial of defendants' motion to dismiss, plaintiffs have moved for summary judgment that defendants' failure to issue evidence of status violates the Administrative Procedure Act (hereinafter "APA") and the Due Process Clause of the Fifth Amendment. Defendants have cross-moved for summary judgment that the claims of certain class members are nonjusticiable, and that defendants' failure to issue evidence of status is lawful and reasonable. Having considered the arguments of the parties, and for the reasons set forth below, the court issues the following order.

## BACKGROUND

Named plaintiffs Maria Santillan, et al., were granted the status of lawful permanent resident ("LPR") by Immigration Judges or by the Board of Immigration Appeals, constituent courts of the Justice Department's Executive Office of Immigration Review ("EOIR").[1] Following the EOIR's determination, plaintiffs sought documentation of their adjusted status as LPRs from their local United States Citizenship and Immigration Services ("USCIS") sub-office, through a process called Alien Documentation, Identification and Telecommunication ("ADIT") processing.[2]

Prior to September 11, 2001, plaintiffs would generally have been able to obtain temporary documentation of their adjusted status within a week of presenting a copy of the order issued by the EOIR to their local USCIS sub-office. Statement of Undisputed Facts (hereinafter "SUF") ¶ 17; see Chen Dec. Ex. I at 28:22–29:14. Beginning some time after September 11, 2001, the Department of Homeland Security ("DHS"), which oversees USCIS, changed the policy for applicants for documentation. Under the new policy, all applicants for documentation of adjusted status have been required to undergo background and security checks involving multiple federal agencies. SUF ¶ 24; see Aug. 9, 2004 Sposato Dec. ¶¶ 1–9. Until those checks are completed, the USCIS has not been permitted to issue any immigration benefit to plaintiffs, such as adjustment of status to lawful permanent residency or the issuance of temporary documentation verifying LPR status. SUF ¶ 23; see Aug. 9, 2004 Sposato Dec. ¶¶ 11–12.

Under these new procedures, persons granted LPR status waited from several months to over one year for the commencement of their ADIT processing, in addition to weeks or months for the completion of processing and the issuance of documentation verifying LPR status. SUF ¶ 32. As many as 12,539 persons adjudicated to be LPRs after October 1, 2000 may not have received documentation of status from USCIS. SUF ¶¶ 64–65. During the post-adjudication, pre-documentation period, some class members lost work and travel authorization due to the expiration of their former immigration status, the refusal of agencies to renew work authorizations due to the immigrants' adjustment to LPR status, and lack of documentation of their new LPR status. SUF ¶¶ 51–55, 67, 70, 96–98, 100.

On July 4, 2004, plaintiffs filed an action for declaratory and injunctive relief, seeking to compel defendant officials to issue LPRs evidence of their adjusted legal status "in a timely manner." On October 12, 2004, this court certified plaintiffs' claims as a class action. See Santillan v. Ashcroft, 2004 WL 2297990 (Oct. 12, 2004 N.D.Cal.) (Patel, J.).

On April 1, 2005 after class certification in this action, a new system of EOIR regulations went into effect which reorganized the procedures governing security and law enforcement investigations of putative class members in several ways. Most significantly, the new regulations re-

---

1. The present class action concerns only those aliens who are removable from the United States and placed in immigration proceedings with the constituent courts of the EOIR. Class members have been granted permanent residency as relief from removal, often referred to as a "defensive" adjustment of status. See Aug. 9, 2004 Sposato Dec. ¶ 2. The class does not encompass those persons who apply for "affirmative" adjustment of status based on a direct application to the USCIS for an immigration benefit. See id. ¶ 1.

2. The USCIS is a division of the Department of Homeland Security (referred to herein as "DHS") which is responsible for administering immigration laws.

positioned the timing of security examinations of applicants, requiring those examinations to be completed *before* an alien's *application* for adjustment of status can be heard by an immigration judge, rather than *after* a *grant* of adjusted status. *See generally* 8 C.F.R. § 1003.47.

Specifically, the new regulations change the timing, notice, and allocation of responsibility for security checks. At the front end, at any hearing in which an alien files or expresses intent to file an application for relief that is subject to background checks, the "DHS shall notify the respondent of the need to provide biometrics and other biographical information and shall provide a biometrics notice and instructions to the respondent for such procedures." *Id.* § 1003.47(d). Immigration judges are instructed to account for security processing in scheduling hearings, and security checks must be conducted "as promptly as is practicable (considering, among other things, increased demands placed upon such investigations)." *Id.* § 1003.47(e). Where investigations are incomplete by the time of the hearing, the immigration judge may grant a continuance or hear the case on the merits; however, the judge may not grant an application for immigration relief if the examinations are incomplete or not current. *Id.* § 1003.47(f)-(g). *See also Id.* § 1003.1 (instructing that the Board of Immigration Appeals shall not issue a decision affirming or granting an alien an immigration status, benefit, or relief that requires completion of security investigations if such investigations have not been completed during the proceedings, the results of prior investigations are no longer current, or investigations have uncovered any information bearing on the merits of the alien's application). Where an investigation is complete and an immigration judge has granted LPR status, the "decision granting such relief shall include advice that the respondent will need to contact an appropriate office of DHS." *Id.* § 1003.47(i). The new regulatory scheme affects only EOIR processes, with no instructions or guidelines for USCIS issuance of documentation.

Defendants moved to dismiss in light of the new regulations, arguing that the claims of plaintiffs adjusted by the EOIR after April 1, 2005 ("post-April 1 plaintiffs") are either moot or not yet ripe, and that the class of plaintiffs adjusted by the EOIR before April 1, 2005 ("pre-April 1 plaintiffs") is rapidly shrinking and will disappear without the intervention of this court. On July 1, 2005 this court denied defendants' motion. *See Santillan v. Ashcroft*, No. C 04–2686 (N.D.Cal. July 1, 2005) (Patel, J.). In denying defendants' motion this court noted that the ripeness requirement does not provide the proper framework in which to analyze the justiciability of the claims of the post-April 1 plaintiffs. Rather, the proper question was whether the change in regulations on April 1 rendered the claims of certain class members moot. This court concluded that the post-April 1 plaintiffs are likely to experience delays related to the same internal communication difficulties and other bureaucratic inefficiencies that have affected the pre-April 1 plaintiffs, and that their claims are therefore not moot. Finally, this court noted that the April 1, 2005 change in regulations might require dividing the existing class into two subclasses.

In the Statement of Undisputed Facts accompanying these motions for summary judgment, the parties list the following facts relevant to the post-April 1 plaintiffs. First, some of the delay experienced by pre-April 1 plaintiffs is attributable to misrouted files, inefficiency, and human error. SUF ¶ 43. USCIS makes use of the same types of files and procedures in processing the applications of at least some post-April 1 plaintiffs. SUF ¶ 44.

USCIS does not ensure that the applications of post-April 1 plaintiffs are processed within a prescribed period of time. SUF ¶ 45. Nor does USCIS track the number of times a post-April 1 plaintiff makes requests for documentation. SUF ¶¶ 40–42. Finally, the security checks that were previously done following determination of status, and on which USCIS places much of the blame for delays experienced by pre-April 1 plaintiffs, usually take no more than 48 hours to complete. SUF ¶¶ 27–28.

Based on the continued failure of pre-April 1 class members to obtain documentation and evidence that administrative delays will persist for post-April 1 class members, plaintiffs move for summary judgment that defendants are improperly withholding permanent documentation of status, and that Defendants' decision to cease providing temporary documentation was arbitrary and capricious. Defendants move for summary judgment that the DHS is not in violation of its duty to provide documentation, and that the decision to cease issuing temporary documentation was rational. Defendants also argue in the alternative, as in their earlier motion to dismiss, that the claims of the post-April 1 class members are not yet ripe.

*LEGAL STANDARD*

*I. Summary Judgment*

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.

*Id.* The moving party for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id.; Gasaway v. Northwestern Mut. Life Ins. Co.,* 26 F.3d 957, 960 (9th Cir.1994). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Masson v. New Yorker Magazine,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed.R.Civ.P. 56(a). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e).

*II. Subclass Certification*

Under Federal Rule of Civil Procedure 23(c)(4)(B), a class may be divided into subclasses when appropriate. A court may certify subclasses after initial class

certification. Fed.R.Civ.P. 23(c)(1)(C). A court may divide a class into subclasses on motion of either party, or *sua sponte*. *Burka v. New York City Transit Authority*, 110 F.R.D. 595, 603–04 (S.D.N.Y.1986).

### III. Mootness

The jurisdiction of federal courts depends on the existence of a "case or controversy" under Article III of the Constitution. *PUC v. FERC*, 100 F.3d 1451, 1458 (9th Cir.1996). "A claim is moot if it has lost its character as a present, live controversy." *American Rivers v. National Marine Fisheries Service*, 126 F.3d 1118, 1123 (9th Cir.1997) (citing *American Tunaboat Ass'n v. Brown*, 67 F.3d 1404, 1407 (9th Cir.1995)). "In the context of declaratory and injunctive relief, [a plaintiff] must demonstrate that she has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that she will again be wronged in a similar way." *Bird v. Lewis & Clark College*, 303 F.3d 1015, 1019 (9th Cir.2002) (internal quotation marks and citation omitted), *cert. denied*, 538 U.S. 923, 123 S.Ct. 1583, 155 L.Ed.2d 314. Where the activities sought to be enjoined have already occurred and the courts "cannot undo what has already been done, the action is moot." *Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1379 (9th Cir. 1978). "The burden of demonstrating mootness is a heavy one." *Northwest Environmental Defense Center v. Gordon*, 849 F.2d 1241, 1243 (9th Cir.1988).

 A defendant's voluntary cessation of a challenged practice does not render a case moot unless the party asserting mootness meets the "heavy burden" of showing that it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *See Students for a Conservative America v. Greenwood*, 378 F.3d 1129, 1131, *amended by* 391 F.3d 978 (9th Cir.2004) (*quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). The standard for assessing voluntary cessation is "stringent." *Laidlaw*, 528 U.S. at 189, 120 S.Ct. 693.

### IV. Ripeness

 "Ripeness doctrine protects against premature adjudication of suits in which declaratory relief is sought," *Hodgers–Durgin v. de la Vina*, 199 F.3d 1037, 1044 (9th Cir.1999) (en banc), in order to prevent "entanglement in theoretical or abstract disagreements that do not yet have a concrete impact on the parties." *18 Unnamed "John Smith" Prisoners v. Meese*, 871 F.2d 881, 883 (9th Cir.1989). The ripeness inquiry contains both a constitutional and a prudential component. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). Ripeness is evaluated at the commencement of a lawsuit, and is not subsequently defeated through changed circumstances. *Malama Makua v. Rumsfeld*, 136 F.Supp.2d 1155, 1161 (D.Haw. 2001).

### V. APA

#### A. Jurisdiction under the APA

The APA provides for judicial review where "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. " '[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

#### B. APA Section 706(2)(A)

 Under 5 U.S.C. § 706(2)(A), a court shall hold unlawful agency actions that are "arbitrary, capricious, an abuse of discre-

tion, or otherwise not in accordance with law." When an agency acts either to create or rescind a regulation, it must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citation and internal quotations omitted).

■ A reviewing court must consider the administrative record before the agency at the time the agency carried out the action. *National Wildlife Federation v. United States Army Corps of Eng'rs,* 384 F.3d 1163, 1170 (9th Cir.2004).

### C. APA Section 706(1)

■ Under 5 U.S.C. § 706(1), a court "shall ... compel agency action unlawfully withheld or unreasonably delayed." The elements of a claim under § 706(1) are a discrete, ministerial duty; a delay in carrying out that duty; and a determination that the delay was unlawful or unreasonable in light of prejudice to one of the parties. *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 124 S.Ct. 2373, 2378–80, 159 L.Ed.2d 137 (2004); *Rockbridge v. Lincoln,* 449 F.2d 567, 569–73 (9th Cir.1971).

The Ninth Circuit has adopted a six-factor test for determining when an administrative delay is unreasonable.

(1) the time agencies take to make decisions must be governed by a "rule of reason";

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Telecommunications Research & Action Ctr. v. FCC,* 750 F.2d 70, 80 (D.C.Cir.1984) ("TRAC"); *Brower v. Evans,* 257 F.3d 1058, 1068–69 (9th Cir.2001) (utilizing the TRAC considerations to evaluate the reasonableness of agency delay).

### DISCUSSION

Before reaching the merits of the parties' dispositive arguments, this court must first resolve three preliminary questions. First, the court must determine if, in light of the April 1, 2005 changes to EOIR regulations, the existing certified class should be divided into two subclasses. Second, defendants renew in their motion for summary judgment the argument that the claims of class members adjudicated by the EOIR after April 1, 2005 are not yet ripe. Third, defendants move for additional discovery under Federal Rule of Civil Procedure 56(f) in order to respond to certain affidavits included by plaintiffs with their motion.

### I. Subclass Certification for Pre— and Post–April 1, 2005 Plaintiffs

■ At the conclusion of the order denying defendants' motion to dismiss, this court noted that it would consider dividing the certified class into two subclasses distinguished on the basis of the class members' date of EOIR adjudication (i.e., a pre-April 1, 2005 subclass and a post-April

1, 2005 subclass). The court finds that the change in regulations on April 1 and differences in the factual record for pre— and post-April 1 class members weigh in favor of dividing the existing class into two subclasses.

Under the post-April 1, 2005 regulations, an immigration judge will not hear an alien's application for LPR status until the judge receives confirmation that security checks for the class member are complete and up to date. In addition, immigration judges and the BIA are not able to grant or affirm LPR status if the security checks have uncovered information bearing on the merits of the alien's application. As a result, all class members adjudicated to be LPRs under the post-April 1, 2005 regulations have already been determined, to the extent possible, not to be a security risk. In contrast, class members processed under the pre-April 1, 2005 regulations may not have completed security checks prior to being granted LPR status. This distinction has bearing on defendants' national security arguments, which have substantially less merit when applied to an LPR already determined not to be a known threat.

The undisputed factual record is also different for pre— and post-April 1 class members in significant ways. Defendants have stipulated that up to 12,359 members of the pre-April 1 group still await permanent documentation, but have made no such stipulation for the post-April 1 subclass. SUF ¶ 65. Defendants have also stipulated that some pre-April 1 class members have waited more than a year following their EOIR adjudication without receiving evidence of status. SUF § 32. Defendants have made no such stipulation with respect to post-April 1 class members; nor could defendants do so, as the time elapsed since the new regulations went into effect is less than five months. Based on these differences in the factual record and the effect of the new regulations on the parties' legal arguments, the court finds that the class should be divided into two subclasses.

The first subclass (the "pre-April 1 subclass") consists of all those persons who were or will be granted lawful permanent resident status by the EOIR under regulations in effect prior to April 1, 2005 through the Immigration Courts or the Board of Immigration Appeals of the United states, and to whom USCIS has failed to issue evidence of registration as a lawful permanent resident, with the exception that the class excludes the 34 named plaintiffs in *Lopez–Amor v. United States Attorney General,* No. 04–CV–21685 (S.D. Fla.) and the plaintiff class in *Padilla v. Ridge,* No. M 03–126 (S.D.Tex.).

The second subclass (the "post-April 1 subclass") is identical to the first subclass, with the sole difference that the persons in the second subclass were or will be granted lawful permanent resident status by the EOIR under regulations in effect on April 1, 2005 or thereafter.

Plaintiffs have already identified at least two class members who received EOIR adjudication on or after April 1, 2005. Chen Dec. Ex. T. Defendants have noted, however, that one of the class members identified by plaintiff, adjudicated to be a LPR on April 1, 2005 was actually processed under the pre-April 1, 2005 regulations and had therefore not gone through security screening prior to adjudication. Given this court's decision to divide the class into two subclasses, plaintiffs are ordered to file a list of named members of the post-April 1 subclass, including any required disclosures, within 30 days of this order.

## II. Justiciability of Post–April 1, 2005 Class Member Claims

In their motion for summary judgment, defendants repeat the ripeness argu-

ment previously advanced in the context of defendants' motion to dismiss. Defendants assert that their adoption of new regulations for the processing of status documentation has "de-ripened" the claims of the post-April 1 subclass.

■ This argument is both legally incorrect and procedurally improper. As this court has already explained, ripeness is evaluated at the commencement of each stage of litigation. None of the cases cited by defendant suggests that a claim can "de-ripen" over time. All of the cases consider precisely the opposite situation: where the passage of time during litigation has caused claims that were arguably not yet ripe when the lawsuit was filed to ripen. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("the date of their all but certain exercise is now closer by several months than it was at the time the Court of Appeals ruled"); *American Motorists Ins. Co. v. United Furnace Co.,* 876 F.2d 293, 302 (2d Cir.1989) (finding that plaintiff's claim was ripe both at the time of the district court's dismissal and on appeal). Claims do not de-ripen; they become moot.

■ When a defendant makes a change to the challenged practice during the course of litigation, the proper framework for analyzing the effect of that change is the "voluntary cessation" doctrine, a subspecies of mootness. This court has already ruled that defendants have failed to show that the adoption of the new regulations has "completely and irrevocably eradicated the effects of the alleged violation." *See Norman–Bloodsaw v. Lawrence Berkeley Labs.,* 135 F.3d 1260, 1274 (9th Cir.1998). This argument already has been put to rest. It is not an appropriate issue to revisit on summary judgment.

### III. Defendants' Motion to Strike

Defendants raise a second threshold question in their separate motion to strike: whether plaintiffs can use the twenty affidavits attached as Exhibit T to the Chen Declaration in support of their motion for summary judgment. The affidavits contain statements of twenty aliens who are not named plaintiffs, but who have been adjudicated to be LPRs and had not yet received documentation of status as of the time of the affidavits. Defendants do not dispute that these affidavits are based on the "personal knowledge" of the affiants, that they set forth facts that would be admissible in evidence should the affiants testify at trial, or that the affiants are "competent to testify to the matters stated therein." *See Fed.R.Civ.P. 56(e).* Defendants assert instead that affidavits from fact witnesses must be "tested" through deposition of those witnesses.

Defendants cite no authority establishing a *per se* rule that fact witnesses must be made available for deposition before their affidavits may be used in support of a motion for summary judgment. Rather, defendants claim that under Rule 56(f) they are entitled to conduct additional discovery to rebut the claims made in the new affidavits. In particular, defendants wish to determine whether the affiants in fact attempted to contact USCIS to obtain documentation, and whether the affiants otherwise complied with the registration requirements.

In order to obtain additional discovery under Rule 56(f), the non-moving party must provide affidavits establishing that facts essential to opposing the motion are "unavailable." Fed.R.Civ.P. 56(f); *Hancock v. Montgomery Ward Long Term Disability Trust,* 787 F.2d 1302, 1306 (9th Cir.1986). Defendants argue in their motion to strike and accompanying declaration that many of the named plaintiffs

exacerbated the harms associated with delays in issuing documentation by failing to comply with the procedures for obtaining documentation, and that it is likely that the twenty new affiants similarly contributed to any delays they may have experienced. According to defendants, the facts surrounding each plaintiff's failure to receive documentation are essential because "[t]he legal standards for the claims of Plaintiffs under the Administrative Procedures Act, the Due Process Clause of the Fifth Amendment, and for a writ of mandamus all require a balancing of the actual harms suffered by class members." Defs.' Opening Brief at 5.

As an initial matter, defendants' argument does not apply to plaintiffs' claim under 5 U.S.C. section 706(2)(A), which pertains to the post-September 11, 2001 decision to cease issuing temporary documentation. In evaluating a claim under section 706(2)(A), this court must examine the administrative record as it existed at the time the policy change took place. *National Wildlife Federation,* 384 F.3d at 1170. The actual harms suffered by plaintiffs four years later, such as those alleged in plaintiffs' affidavits, are irrelevant to this examination.

 With respect to plaintiffs' claim under 5 U.S.C. section 706(1), it is not clear from defendants' brief and affidavits what essential information might be obtained in additional depositions. Of the twenty new affiants, nineteen are members of the pre-April 1 subclass.[3] Defendants have already represented in the Statement of Undisputed Facts that up to 12,539 members of the pre-April 1 subclass are still awaiting documentation, and that some of the pre-April 1 subclass have waited more than a year without receiving evidence of status. SUF ¶¶ 32, 65. That

plaintiffs may have contributed to delays in individual cases does not contradict or undermine the significance of either undisputed fact.

Also, for the post-April 1 subclass, plaintiffs are seeking injunctive relief and do not need to prove past harms for particular class members in order to prevail. Rather, plaintiffs must show "some cognizable danger of recurrent violation." *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Plaintiffs of course may show this by providing actual examples of post-April 1 delay. On the other hand, as already discussed in the context of this court's order denying defendants' motion to dismiss, and as supported by the parties' joint Statement of Undisputed Facts, defendants have presented no evidence that many of the root causes of delay for the pre-April 1 subclass have been eliminated for the post-April 1 subclass. The April 1 regulations make no changes to the manner in which USCIS tracks the applications of LPRs or the way in which USCIS interacts with other agencies to process LPR applications for documentation.

Defendants argue that this court should be reluctant to consider granting relief on the basis of uncertain future harm to the post-April 1 subclass because of national security concerns, citing *Getty Images News Servs., Corp. v. Department of Def.,* 193 F.Supp.2d 112, 117 (D.D.C.2002). In *Getty Images,* the district court considered a news organization's constitutional right to be included in unspecified future "media pools" in combat zones. *Id.* at 113–14. The court concluded that it could not adjudicate "hypothetical disputes in which the specifics of the challenged policies, the relevant factual context, and even the identify

---

**3.** One of the nineteen pre-April 1 affiants received adjudication on April 1, 2005, but was processed under the pre-April 1 regime.

[sic] of the injured plaintiff are a matter of conjecture." *Id.* at 118. Defendants do not explain how *Getty Images* is applicable here, where the challenged policies are well-defined, the factual context—delay in issuing documentation—is sufficiently specified, and the plaintiffs are identified by way of the class definition.

 Defendants have failed to meet their burden under Rule 56(f) in yet another way. To prove that information is unavailable, the non-moving party must at least show what efforts it made to obtain the information and why those efforts were unsuccessful. *Mason Tenders Dist. Council Pension Fund v. Messera,* 958 F.Supp. 869, 894–95 (S.D.N.Y.1997). It is undisputed that defendants do not maintain systematic records of each attempt an alien makes to obtain documentation. SUF ¶¶ 40–42. Defendants certainly have access, however, to whatever records exist for the contested affiants and could produce whatever relevant information is contained in their files. At a minimum, defendants could determine whether now, over four months after the last of the affiants was granted LPR status, the affiants have received temporary or permanent documentation. Defendants have not done so. Nor have defendants presented other evidence that might call the affidavits into question, such as evidence that bureaucratic delays in processing have decreased following the April 1 change in regulations. As defendants apparently already have access to information that would allow defendants to oppose plaintiffs' motion, it is not clear that further discovery is warranted. *See Mason Tenders,* 958 F.Supp. at 895 ("Relief under Rule 56(f) is not appropriate where the discovery allegedly desired pertains to information already available to the non-moving party") (internal quotations omitted).

In order to provide defendants with every reasonable opportunity to oppose plaintiffs' motion for summary judgment under section 706(1), the court will permit defendants to file, within 30 days of this order, additional affidavits in support of their Rule 56(f) motion. The affidavits should first describe the efforts defendants have made to obtain the information by other means, such as consulting the files for the affiants, and explain why sufficient information is not available that would permit defendants to oppose plaintiffs' motion. The affidavits should then clearly set forth the specific facts that defendants hope to obtain in deposition and the reason that the additional facts would preclude summary judgment with respect to either subclass. If defendants carry their burden under Rule 56(f), the court will revisit its ruling with respect to plaintiffs' claim under section 706(1).

Having resolved these preliminary questions, the court now turns to the substance of the cross-motions for summary judgment.

## IV. APA Claims

Plaintiffs assert two violations of the APA that would permit a judicial remedy under 5 U.S.C. section 702. First, plaintiffs claim that defendants' decision following September 11, 2001 to cease issuing temporary documentation was arbitrary and capricious, and not supported by an adequate administrative record, in violation of section 706(2)(A). Second, plaintiffs claim that defendants have a purely ministerial duty to issue documentation of LPR status following a determination by the EOIR and that DHS has no authority to make an independent determination of eligibility. Defendants' delay in issuing documentation is therefore allegedly unlawful or unreasonable, in violation of section 706(1).

Defendants argue that the decision to cease issuing temporary documentation

following September 11, 2001 was rational and grounded in sound policy choices. Defendants also assert that USCIS does not have a ministerial duty to issue documentation of LPR status, but rather has broad discretion in deciding when and if to issue documentation. In the alternative, defendants argue that even if USCIS has a duty to issue documentation promptly, any delays faced by plaintiffs are reasonable in light of national security concerns.

### A. Decision to Cease Issuing Temporary Status Documentation

■ Defendants have provided no contemporaneous record of the facts and analysis supporting the post-September 11 decision to cease issuing temporary documentation. The only evidence of contemporaneous analysis discussed in the parties' motions is as follows. First, defendants conducted a "small study internally about the security checks that had been performed in certain cases coming from immigration courts." SUF ¶ 19. Second, defendants engaged a contractor to conduct a "larger study about various aspects of security checking, but that study did not particularly relate to cases coming from immigration court." SUF ¶ 20. Third, defendants "made multiple attempts to collect information about the results of security checks." SUF ¶ 21. Defendants have not provided any of the results of these studies or investigations for review. *Id.*

Without the ability to examine the studies cited by defendants in order to determine whether they support the post-September 11 policy change, this court is unable to conclude that the policy change

had any rational basis. The fact that defendants now argue, in the context of litigation, that national security concerns justified the change in policy is irrelevant, as a reviewing court must look to the administrative record at the time the change was made. *See National Wildlife Federation,* 384 F.3d at 1170. Similarly, citations to the 9/11 Commission report, published in 2004, have no bearing on a rule created over two years earlier.

Even if defendants were correct in arguing that a rationale crafted during litigation can be used to justify an earlier rule change, or in the event that defendants choose to issue new regulations, the national security justification as stated does not support a blanket policy of withholding temporary documentation from all EOIR-adjusted LPRs. First, defendants have not established any actual connection between EOIR-adjusted LPRs and threats to national security. Defendants are unable or unwilling to identify a single EOIR-adjusted LPR who has been identified as a possible national security threat, much less one who has been detained or deported as a result of security concerns. SUF ¶¶ 30, 46. Moreover, the EOIR has already thoroughly reviewed all of the evidence presented by the alien and by DHS before granting LPR status to each class member.[4] SUF ¶¶ 4–5.

Second, defendants offer no reasonable justification for prolonged delays in the security checking process in the majority of cases, which would provide some reason for withholding temporary documentation. USCIS currently performs two security checks for each alien who applies for LPR status.[5] SUF ¶ 24. The first, an FBI

---

**4.** It is also apparently undisputed that the EOIR performed the FBI fingerprint check, one of the two security checks currently performed by USCIS, even prior to the April 1, 2005 change in regulations. *See* Defs.' Opening Brief at 14.

**5.** At oral argument, defendants acknowledged that they perform a third, time-consuming FBI name check in some cases. Defendants represented, however, that they do not delay issuing documentation pending completion of this check.

fingerprint check, is generally completed in 48 hours or less, unless the check yields some potentially incriminating information. SUF ¶ 27. The second, an "IBIS check," may be performed in less than ten minutes, unless the check yields some potentially incriminating information. SUF ¶ 28. Defendants have presented no evidence and made no argument that the particular LPRs awaiting processing are delayed because of information uncovered through the security checks.

Third, defendants do not adequately consider alternate mechanisms for addressing national security objectives in the immigration process. It is imperative that administrative agencies explain possible alternatives and give adequate reasons for rejecting them. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 48, 103 S.Ct. 2856. The DHS has many options for limiting the freedom of individuals determined to present a threat. The DHS exercises substantial control over the EOIR proceedings themselves; the DHS may move to reopen decisions to grant LPR status, appeal an immigration judge's decision to the Board of Immigration Appeals, or ask to have the case referred to the Attorney General for final review SUF ¶¶ 8–9. After exhausting any administrative appeals, the DHS may pursue collateral attacks on the administrative decision, such as initiating new removal proceedings or seeking to have the earlier proceedings reconsidered, reopened, or rescinded. SUF ¶ 11. Finally, the DHS may detain noncitizens who have been identified as a threat. 8 U.S.C. § 1226(a)(3).

Defendants argue that the process for rescission, revocation, or termination can be prolonged for several months or years, during which time the LPR may enjoy the benefits of documentation, such as the right to work or travel internationally. *Id.* This argument is flawed for several reasons. LPRs identified for possible removal are nonetheless entitled to documentation; defendants are required to provide documentation to LPRs during deportation proceedings. 8 C.F.R. § 264.5(g); § 1.1(p) (LPR status "terminates upon entry of a final administrative order of exclusion, deportation, or removal"). If the DHS has reasonable grounds to believe that a LPR is engaged in an "activity that endangers the national security of the United States," it may detain the LPR. 8 U.S.C. § 1226a(a)(3). Defendants object to detaining LPRs who are subsequently determined to be a threat due to the "problem that such an individual would not be subject to detention, and (under Plaintiffs' scheme) would be in possession of LPR documentation, until he or she was actually determined to pose a danger to the United States." Far from being a "problem," requiring a specific justification before depriving a qualified alien of the rights to work and travel is precisely what is lacking in the blanket deprivation that defendants have established.

Fourth, defendants' concern about issuing documentation prior to conducting security checks does not apply to members of the post-April 1, 2005 subclass. Under the April 1 regulations, the EOIR may not grant LPR status until the required checks are completed and up-to-date. 8 C.F.R. §§ 1003.47(f)-(g), 1003.1. Any alien adjudicated to be a LPR in the post-April 1 regime is therefore already deemed not to be not a threat as determined by defendants' choice of background checks.[6]

Fifth, it is far from clear that defendants' security checks are useful in detecting potential threats to national security.

---

6. It is true that the background checks may expire between the EOIR adjudication and the time at which USCIS issues documentation of status. SUF ¶ 29. USCIS is no doubt capable of crafting a fair procedure for handling such a case.

By defendants' own admission at oral argument, the procedures challenged in this action would not have caught a single September 11 hijacker. Also, in arguing that the security screening previously performed by the EOIR was inadequate, defendants disparage the EOIR's reliance on the FBI fingerprint check—the very same check USCIS now employs to screen LPRs—as "feckless" because "al Qaeda selected young mujahideen with clean records to avoid raising alerts during travel." Defs.' Opening Brief at 14; SUF ¶ 108.

Sixth, even assuming that defendants' security checks identify potential terrorists, it is unclear on this record that depriving aliens already present in the United States of status documentation furthers national security interests. As defendants acknowledge, having status documentation is a prerequisite for lawfully obtaining employment. SUF ¶ 48. To the extent that plaintiffs constitute a "shadow population, whose affiliations, associates, and indeed very identities were unknown," as defendants allege, forcing plaintiffs to obtain illegal employment delays the point at which plaintiffs can emerge from those shadows. Also, denying status documentation affects an alien's right to travel only in a very limited way—preventing the alien from reentering the United States following travel abroad. Defendants have articulated no reason why this type of travel, as opposed to the domestic air travel exploited on September 11, 2001, presents a threat to national security.

■■■ Administrative agencies such as USCIS must explain and justify their actions in order to permit meaningful checks on executive power. "Expert discretion is the lifeblood of the administrative process, but unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discre-

tion." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48, 103 S.Ct. 2856 (quoting *New York v. United States*, 342 U.S. 882, 884, 72 S.Ct. 152, 96 L.Ed. 662). It is "obvious and unarguable" that national security is of paramount importance, *see Aptheker v. Secretary of State*, 378 U.S. 500, 509, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), and it is equally obvious that the agencies entrusted with preserving that security should take great pains to make rational use of their limited resources. Defendants' repeated, conclusory appeals to national security concerns do not withstand careful scrutiny and leave this court with no basis for concluding that the post-September 11 policy rationally furthers national security interests. This court concludes that the rule change was "arbitrary and capricious" within the meaning of 5 U.S.C. section 706(2)(A).

### B. Failure to Issue Permanent Status Documentation

Plaintiffs also contend that defendants have a purely ministerial duty to provide documentation after the EOIR has made a final determination of LPR status, and that defendants may not independently decide to hold up individual files for additional review. Defendants argue that 8 U.S.C. section 1304(d) gives USCIS absolute discretion in deciding when to issue documentation, and that there is no requirement for USCIS to provide the documents to LPRs within a reasonable period of time. In the alternative, USCIS argues that regardless of the statutory or regulatory allocation of authority, USCIS has discretion to withhold documentation in order to protect national security interests.

#### 1. Duty to Issue Documentation

■■■ This court disagrees with defendants' position that section 1304(d) gives USCIS unfettered discretion as to when it

issues documentation of status. Section 1304(d) provides, in relevant part, that LPRs who have been registered and fingerprinted "shall be issued a certificate of alien registration or an alien registration receipt card in such form and manner and at such time as shall be prescribed under regulations issued by the Attorney General." It is settled law that USCIS must issue status documentation in response to the EOIR's determination of eligibility and cannot substitute its decision for that of the immigration judge. *Loa–Herrera v. Trominski*, 231 F.3d 984, 988 (5th Cir. 2000) ("federal law guarantees LPR's certain rights of documentation they can use to prove, to potential employers and others, their right to be in the United States"); *Etuk v. Slattery*, 936 F.2d 1433, 1444 (2d Cir.1991) ("The INA mandates that the Attorney General provide LPRs who register with proof of their legal status").

■ Defendants rely heavily on the last clause of section 1304(d), which provides that the Attorney General may regulate the "time" and "manner" of issuing documentation, in arguing that USCIS has no duty to provide documentation within a reasonable period of time. *See Loa–Herrera*, 231 F.3d at 988 (how the right to documentation is protected in practice is within the "express discretion of the Attorney General"). No previous case squarely addresses the Attorney General's discretion with respect to timing. Both *Etuk* and *Loa–Herrera*, however, suggest that any such discretion is limited by the need to preserve the rights guaranteed to LPRs.

In *Etuk*, the Second Circuit held that certain forms of temporary documentation issued by the INS, the predecessor of US-CIS, were inadequate to protect the rights guaranteed to LPRs. *Etuk*, 936 F.2d at 1443. The temporary documentation in question contained language suggesting that the holder's employment authorization was temporally restricted. *Id.* at 1445. LPRs in possession of the temporary documentation therefore had difficulty obtaining permanent employment. *Id.* The INS argued that it was not required to issue documentation that demonstrated employment authorization. *Id.* at 1444. The court disagreed, noting that LPRs enjoy "enhanced" rights. *Id.* at 1443. "While we think the Executive still enjoys discretion when dealing with these individuals, we believe that the exercise of that discretion is subject to more intense judicial scrutiny." *Id.* at 1443–44.

*Loa–Herrera* is not to the contrary. The Fifth Circuit in *Loa–Herrera*, as the court in *Etuk*, considered the form of documentation that the Attorney General is required to provide. The court concluded that the Attorney General was bound by existing regulations to issue a particular form—form I-551—and did not consider any limits on the Attorney General's ability to create new regulations that provided for different forms. *Loa–Herrera*, 231 F.3d at 989. In reaching this holding, however, the court cited *Etuk* for the proposition that the INA "mandates that the Attorney General provide LPRs who register with proof of their legal status." *Id.* at 988 n. 8.

Defendants seek to distinguish *Etuk* in part based on the time it was decided—in 1991, prior to September 11, 2001—arguing that the concerns raised in *Etuk* were different and "less portentous" than those that exist today. To the extent this argument has merit, it relates not to the existence of the duty to provide documentation, which flows from a statutory scheme that is unchanged in relevant part since 1991, but rather to the reasonableness of any deviation from that duty. The reasonableness of USCIS's withholding documentation is discussed below.

The court concludes that USCIS has a duty to provide documentation to LPRs at a time that does not unreasonably compromise the LPRs' enhanced rights.

### 2. Breach of Duty

The facts and arguments surrounding defendants' breach of the duty to issue documentation are distinct for the pre-April 1 subclass and the post-April 1 subclass. This court will consider each subclass in turn.

#### a. Pre–April 1 Subclass

■ Plaintiffs and defendants agree that many members of the pre-April 1 subclass continue to await documentation of their status. Although proof of LPR status for the named plaintiffs was expedited upon the commencement of this lawsuit, up to 12,539 other LPR class members still awaiting documentation have no such source of special help. SUF ¶ 65. These unnamed plaintiffs face the same lack of responsiveness from USCIS, bureaucratic confusion and misplacement of files, and long delays for security checks that once affected the named plaintiffs. SUF ¶ 9. Given that the named pre-April 1, 2005 plaintiffs waited sixteen months on average from the date of their EOIR order, the delay faced by the rest of the subclass members may stretch into multiple years without court intervention. See Chen Dec., Exh. I at 163:5–166:10, 169:11–171:2; Exh. D at 3:2–5.

Based on the preceding undisputed facts, this court therefore finds that no material dispute exists that defendants are in breach of their duty to provide timely documentation of status with respect to the pre-April 1 subclass.

#### b. Post–April 1 Subclass

■ Defendants argue that plaintiffs have pointed out only one instance of a post-April 1, 2005 class member experiencing delays, and thus have not carried their burden of demonstrating the likelihood of future harm for members of the post-April 1 subclass. Based on the present undisputed record, this court disagrees.[7] Plaintiffs have presented substantial evidence of bureaucratic delays in the processing of applications which are unrelated to security checks, and defendants acknowledge that the same administrative regime that gave rise to these delays remains in place today. The new regulations fail to address any objectives or procedures for accountability in LPR documentation, set a time frame for processing proof of status, or target the USCIS, the actor ultimately responsible for issuing LPR documentation. See generally 70 Fed.Reg. 4743; 8 C.F.R. § 1003; 8 C.F.R. § 1208. With this in mind, the court finds it implausible that a system which was uncoordinated and overwhelmed before the new policy can possibly be rid of all obstructions on April 1, 2005.

Several factors other than the time required to conduct security checks delayed the issuing of status documentation under the pre-April 1 regime. For instance, plaintiffs who had already been cleared by security checks before their LPR adjudication still waited up to twenty-two months before receiving proof of their LPR status. SUF ¶ 34. Ineffective interagency communication within the DHS also contributed to delayed documentation. USCIS Deputy Associate Director of Operations Janis Sposato testified that "the first and maybe longest delay" was between the grant of the immigration benefit and US-CIS notice of the grant, and that she

---

**7.** As discussed in Part III, *supra*, defendants may present by further affidavits facts creat-ing such a dispute, as well as reasons that such facts are currently unavailable.

"wouldn't be surprised" if files were lost, misplaced, or sent to the wrong location. May 4, 2005 Sposato Dep. at 55:7—10; 59:9—60:2. Despite acknowledging these gaping holes in the system, defendants represent these "administrative mistakes" as ongoing and offer no proposals for rectifying them.

In contrast, the amount of time required to conduct security checks is small in most cases. It is undisputed that security checks usually take 48 hours or less unless potential incriminating information is found. SUF ¶¶ 27—28. Defendants have presented no evidence and made no argument that the members of the pre-April 1 subclass were delayed as a result of the time required to investigate such information. Indeed, defendants have not identified a single EOIR-adjusted LPR who is a potential danger to national to security or public safety. SUF ¶¶ 26, 30.

Moreover, the new policies have created additional reasons for delay. Newly adjudicated LPRs are not permitted to schedule the first available appointment to initiate documentation if appointments at the USCIS sub-office are fully booked for the two-week window permitted for scheduling. SUF ¶ 57; May 4, 2005 Sposato Dep. at 66:2—68:18; May 23, 2005 Sposato Dec. ¶ 4 (stating that appointments are available in the "overwhelming majority" of USCIS districts, but noting that some districts continue to experience appointment capacity challenges that the department is struggling to correct). Thus, an LPR must return to the USCIS office every day until an appointment within the next two week period opens for processing, with no limit to the number of times an individual must return to the office before actually obtaining an appointment. May 4, 2005 Sposato Dep. at 66:11—19. USCIS acknowledges that it has no mechanism for tracking the number of times a LPR requests documentation. SUF ¶ 42. Based

on the currently undisputed evidence of ongoing bureaucratic difficulties, the court concludes that no reasonable dispute exists that there is "some cognizable danger of recurrent violation" with respect to the post-April 1 subclass *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. 894.

### 3. Reasonableness of Delay

Defendants' final argument, vigorously contested by plaintiff, is that national security concerns justify any delay in issuing documentation. The force of defendants' argument is different in the pre-April 1 and post-April 1 regimes. The court will therefore consider them separately.

### i. Pre-April 1 Subclass

The Ninth Circuit analyzes the reasonableness of agency delay under the so-called "TRAC factors." *See Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir.1997). Under the first two TRAC factors, agencies are permitted a "reasonable" time to carry out their duties. *Id.* What is reasonable depends on the statutory context. *Id.*

 As already discussed, defendants note that 8 U.S.C. section 1304(d) grants the Attorney General authority to create regulations as to the form and timing of documentation that is issued; defendants argue that this language gives the Attorney General broad discretion in withholding evidence of status. Plaintiffs argue in response that related statutes demonstrate an intent for documentation to be issued quickly. For example, LPRs are required to carry proof of status with them at all times. 8 U.S.C. § 1304(e); *Etuk*, 936 F.2d at 1444. LPRs are not authorized to obtain employment unless they present documentation of status. SUF ¶ 48. Moreover, the benefits of LPR status vest in full on the date of the EOIR's order granting status. 8 U.S.C. §§ 1229b(b)(3),

1255(b). The court finds that the statutory importance of documentation and the immediate vesting of rights weigh in favor or prompt issuance that does not unreasonably compromise LPRs' rights. *See* Part IV.B.1, *supra.*

The third and fifth TRAC factors provide that a reviewing court should take into account the nature and extent of the interests prejudiced by delay, and that delays affecting "human health and welfare" are less tolerable than those affecting economic regulation. *Independence Mining Co.*, 105 F.3d at 509. Here, where the failure to present documentation precludes lawful employment and obtaining certain state benefits, the effect on the welfare of plaintiffs is obvious and undisputed.[8]

Finally, the fourth and sixth TRAC factors provide that a reviewing court should consider the effect of expediting delayed action on agency activities of a higher or competing priority, but that the agency need not be deliberately or improperly withholding benefits in order for the delay to be unreasonable. *Id.* at 510. Defendants' sole justification for the delay in issuing documentation for class members is the need to review each LPR's background to safeguard national security.

Defendants cite several cases in support of their argument that national security concerns trump all others in this case. *See Halperin v. Kissinger*, 807 F.2d 180, 187 (D.C.Cir.1986) (stating that "the concept of a special rule for national security matters, such as reduced due process requirements," is "no stranger to court-made law"). *See also Haig v. Agee*, 453 U.S. 280, 309, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (holding that an individual posing a substantial likelihood of "serious damage"

to national security authorizes the government to revoke the citizen's passport); *Cole v. Young*, 351 U.S. 536, 547, 76 S.Ct. 861, 100 L.Ed. 1396 (1956) (noting the "obvious justification" for summary suspension power where an employee occupies a "sensitive" position in which he could cause serious damage to national security).

Unlike the cases cited in *Halperin*, there is no individual showing in this case that class members pose a serious risk to national security or that defendants' policies further national security interests. *See* Part IV.A, *supra.* Absent any such particularized showing, defendants' national security argument cannot excuse the various permutations of bureaucratic errors, administrative backlogs, and inter-agency communication lapses that have caused the delays at issue in this lawsuit. Accordingly, this court finds that defendants' delay in issuing documentation of status to members of the pre April 1, subclass is unreasonable under section 706(1).

### ii. Post–April 1 Subclass

The statutory mandate and the harms to plaintiffs are identical with respect to the post-April 1 subclass. As discussed in Part IV.B.2.b, *supra*, defendants have not yet produced facts demonstrating that delays under the post-April 1 regulations are likely to subsist.

Defendants' arguments relating to national security have no force when applied to post-April 1 class members. Due to defendants' new policy of holding up EOIR adjudication until all security checks have been completed, defendants have ensured that any class member adjusted after April

---

**8.** Defendants assert that plaintiffs' interests are not compromised because certain class members have managed to remain employed despite lacking documentation of their LPR status. LPRs, however, are entitled to work lawfully. 8 U.S.C. §§ 1324a(h)(3), 1324a(a)(1)(A). Defendants do not dispute that employers who hire individuals without documentation risk civil and criminal penalties. SUF ¶ 48.

1 will already have been deemed not to present a risk to national security, to the extent possible using defendants' chosen security checks. This court therefore finds that defendants' delay in issuing documentation of status to members of the post-April 1 subclass is also unreasonable under section 706(1).

## V. Due Process Claims

As plaintiffs are entitled to summary judgment on their APA claims, this court will not reach plaintiffs' claims that defendants' failure to issue documentation violates the Due Process Clause of the Fifth Amendment.

## VI. Remedy

"A court, where it finds unlawful agency behavior, may tailor its remedy to the occasion." *N.A.A.C.P. v. Secretary of Housing & Urban Dev.*, 817 F.2d 149, 160 (1st Cir.1987); *see also Ford Motor Co. v. NLRB*, 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221 (1939) ("while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action").

Other courts have ordered detailed remedies, including the imposition of concrete deadlines, in response to unlawful agency action or failures to act. *Etuk* (upholding an order to issue temporary documentation of status within 21 days of application); *Public Citizen Health Research Group v. Brock*, 823 F.2d 626, 629 (D.C.Cir.1987) (ordering OSHA to comply with a timetable for rulemaking and to issue interim progress reports). It is also settled, however, that "[t]he court should not deny itself the benefit of agency expertise in the absence of extraordinary circumstances." *Cal–Almond, Inc. v. Yeutter*, 756 F.Supp. 1351, 1356 (E.D.Cal.1991).

Defendants have stated in their briefs and at oral argument that they are taking steps to speed the processing of requests for documentation for the post-April 1 subclass and to complete processing of the existing backlog of pre-April 1 requests. In order to make these assurances more concrete, the court hereby orders defendants to submit, within 60 days, a proposal for timely issuing evidence of status to both subclasses. At a minimum, the proposal should include specific strategies for addressing the following points:

(1) The timing for completing security checks for pre-April 1 subclass members.

(2) The process by which pre-April 1 subclass members can request and obtain documentation following completion of the security checks.

(3) An efficient process for collecting biometric data from members of both subclasses. Ideally, for post-April 1subclass members, the collection of biometric data should occur immediately following the grant of LPR status.

(4) The mechanism for ensuring that USCIS obtains prompt notice of the EOIR's determination.

(5) The process by which post-April 1 subclass members can obtain their documentation once it has issued.

## CONCLUSION

Based upon the foregoing, defendants' motion to strike is DENIED, plaintiffs' motion for summary judgment is GRANTED, and defendants' motion for summary judgment is DENIED. Plaintiffs are hereby ordered to submit to this court and to defendants within 30 days the names and contact information of named plaintiffs for the post-April 1 subclass. Defendants are hereby ordered to submit to this court within 60 days a proposal for timely issuing evidence of status to members of both

subclasses, as outlined above. Defendants are also permitted to submit to this court within 30 days additional affidavits in support of their motion under Rule 56(f).

IT IS SO ORDERED.